DREW, J.
|]Blue Cross and Blue Shield of Louisiana, Inc., Louisiana Health Service and *863 Indemnity Company, Inc., HMO Louisiana, Inc., and RxBlue (collectively referred to as “Blue Cross”), appeal a judgment and supplemental judgment awarding damages and attorney fees for unfair trade practices in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (“LUTPA”). Cupp Drug Store d/b/a Corner Drug Store (collectively referred to as “Cupp”) has answered the appeal seeking an increase in the damages award of $185,000 and attorney fees award of $110,000, as well as additional attorney fees for this appeal.
We affirm the final judgment awarding damages, award $5,000 in attorney fees to Cupp for this appeal, vacate the supplemental judgment awarding attorney fees and costs, and remand.
FACTS
Gil Birch was the owner, chief executive officer, and pharmacist of Cupp in Ruston for nearly 35 years. Cupp had standard walk-in customers, but it also had a significant number of customers in institutional settings such as nursing homes and group homes. Birch thought Cupp was the largest independently owned drug store in Ru-ston in 2007.
Cupp was a provider pharmacy for Blue Cross insureds. Express Scripts, Inc. (“ESI”) was the third-party administrator of Blue Cross’s pharmacy plan.

Investigation

Scot Simmons is the owner of Sterling Pharmacy in Ruston. In the |2spring of 2007,[1] Simmons called Kandyce Cowart, a senior fraud investigator for Blue Cross, concerning allegations against Cupp. On May 15 and 16, Cowart, along with Andrea Lopez, an investigator for ESI, and Ray-land Trisler, an investigator with the Louisiana Board of Pharmacy (“BOP”), conducted an inspection of Cupp.
The inspection of Cupp led Trisler to file complaints with the BOP against Birch and Cupp on July 23. The complaints alleged violations of Louisiana and federal laws. Some of the charges related to Birch and Cupp: (1) not reversing claims for returned medicines, (2) redispensing returned medicines, (3) billing insurers for medications that were not dispensed, (4) having missing drugs, including Hydroco-done, (5) dispensing multiple prescriptions for controlled dangerous substances that were not authorized, (6) allowing pharmacy techs to process and dispense prescriptions outside the supervision of a pharmacist; (7) permitting unsanitary conditions in a storage building where boxes of new prescription vials and nursing home medication blister packs were kept, and (8) keeping improper daily report records.

Lawsuit

On May 17, the pharmacy director of Blue Cross wrote to Birch that effective the next day, Cupp would no longer be considered a participating pharmacy for Blue Cross.
On May 29, Cupp sued Blue Cross and ESI for damages and injunctive relief regarding the termination of Cupp as a participating | (¡pharmacy.[2] The trial court granted ESI’s motion to stay and to compel arbitration, but denied Blue Cross’s motion to stay pending the outcome of arbitration.

Walgreens comes to town

Walgreens announced in 2007 that it was opening a store in Ruston. As explained by William Grayson, regional vice-president of store operations for Walgreens from 2003 until July of 2008, Walgreens’ strategy *864 when entering small markets was to acquire local pharmacies in order to jumps-tart their new stores.
In 2007, Birch received a letter from Walgreens inquiring about whether he would be interested in selling Cupp. Birch’s attorney, Bill Jones, began negotiating with Walgreens in July.[3]
On September 14, Jones sent an email to Russell Lehman, a pharmacy acquisitions specialist for Walgreens, that outlined the key elements of an asset purchase agreement in principle.[4] The deed for Cupp was faxed from Jones to Lehman on September 24.[5] -
14Ricky Indovina, a pharmacy supervisor for Walgreens, met with Birch and Jones at Cupp on September 26. Birch remembered that Indovina asked about Cupp’s files (prescription records) and inventory, and his business practices.
Jones sent an email to Lehman on October 5 in which he disclosed the pending lawsuit and the BOP complaints. Three days later, Jones sent an email to Mary Jen Fisher, a Walgreens paralegal involved with acquisitions, and to Lehman that summarized a telephone conversation that Jones and Fisher had that day. The email listed items that Jones wanted changed or added to the asset purchase agreement. The email also mentioned the pending BOP complaints.
On October 17, Jones wrote to Lehman about his agreement to changes and additions to the asset purchase agreement. Jones also stated that he understood that his email disclosures of litigation were satisfactory. Jones finished by stating that he would have Birch execute two signature pages and then fax and mail the originals to Lehman, signifying Birch’s formal consent to the asset purchase agreement as amended.
On October 23, Fisher emailed Jones asking him to provide details of the pending legal proceedings that had been disclosed on exhibit G of the asset purchase agreement. Jones replied the next day, describing the pending legal proceedings as the pending suit against Blue Cross and ESI for terminating Cupp as a pharmacy provider, the BOP complaints, and a claim against Cupp’s insurer from a customer who claimed he received the wrong prescription.
|5On October 29, Fisher emailed Jones, asking for documentation on each of the pending legal proceedings listed on exhibit G. This email was also sent to Josephine Kramer and Cheryl Creek of Walgreens. Kramer was the senior pharmacy acquisitions coordinator. Creek was the manager of pharmacy acquisitions.
On October 30, Jones wrote a letter to Fisher in which he attached the petition in the suit against Blue Cross and ESI, the BOP complaints, and a demand letter alleging the misfiled prescription. Jones also wrote a short summary of each pro *865 ceeding. Regarding the BOP complaints, he wrote that at the proper time, Birch would respond and refute the charges. He also added that it was important to recognize that the charges were the result of a competitor’s complaint.
On November 1, Jones wrote to Lehman concerning how many prescription drugs had been purchased from Cupp’s suppliers during a one-year period. The next day, Jones emailed Lehman about drug purchases from another supplier.

Change of plans

In the month of November, Walgreens began reconsidering the terms of the agreement. On November 13, Marc Metz, the pharmacy acquisitions implementation coordinator, wrote that Indovina believed the business was legitimate and wanted to move forward with the buyout. However, the price would be lower because no inventory would be purchased and Birch would not be hired. Walgreens would retain some of Cupp’s institutional customers, but not the nursing home customers. Metz also wrote that once 1 fiLehman was able to confirm the average number of prescriptions per day, Walgreens could proceed with renegotiating the price and terms. Metz followed up with Indovina in another email that day which said that Walgreens would restructure the holdback in addition to adjusting the purchase price based on retention.
On November 20, Lehman emailed Grayson to let him know that Birch had verbally accepted the offer of $500,000 for files, and an additional $200,000 to $400,000 depending on the number of prescriptions retained. Walgreens would not purchase the- inventory or offer employment to Birch. Lehman asked Grayson to let him know if he was okay with the changes, which Grayson did by email that day. Later that day, Lehman forwarded his email to Kramer, with Creek cc’ed. He asked Kramer to forward the information to the legal department so they could make the necessary changes to the contract and get it sent to Jones.
Walgreens and Jones began taking steps to facilitate the closing of the sale. Info-werks is a data conversion company hired by Walgreens to transfer the data from the computer systems of the acquired pharmacy and put it in a format that Wal-greens will use. On November 20, Metz emailed Infowerks and Kramer that the closing was now to be held on December 6. He told Infowerks they should be able to contact Birch the next day.
On November 21, Jones emailed Lehman concerning his suggestions of how the employees and the institutions should learn of the sale to Walgreens. Jones thought Walgreens could secure the business from ^institutions when Birch and Indovina met with them the morning after telling Cupp’s employees about the sale.
On November 21, Jones emailed Lehman, wanting to amend the asset purchase agreement to allow Birch to advertise and sell his nonprescription inventory. Lehman forwarded the email to Kramer, who told him to see what Indovina wanted to do. Lehman replied to Kramer to word the agreement so that Birch had to get approval from Walgreens before he did any kind of advertisement. Again on November 21, Jones emailed Lehman about additional changes that Jones wanted to make to the latest draft of the asset purchase agreement so it would conform to the deal. Included were instructions for wiring the check for the purchase.
On November 27, Fisher emailed Jones an asset purchase agreement reflecting the new terms of the deal. Kramer and Creek were also sent this email. Exhibit G to the agreement listed the four pending legal proceedings, including the two BOP *866 complaints. On November 27, Jones emailed Fisher with some suggested changes. Jones added that the agreement was otherwise acceptable to Birch. Lehman and Kramer were cc’ed in this email. The email was forwarded to Creek the next day.
On November 27, Jones emailed to Lehman and Indovina a statement that Birch was going to make to his customers. In-dovina replied to Jones two days later that he thought the statement was clear and accurate, but he wanted Birch to put his personal touch on it. Indovina also asked if Jones had heard about any meetings set up by Birch. Jones replied to Indovina that Birch would not set up any meetings until after he had a signed | ^agreement. Jones added that he would appreciate any help that Indovina could give in moving the deal along.
On November 27, Metz emailed Indovi-na that he was planning on being there for the buyout. He asked Indovina about the interviewing of employees and if Indovina had any questions or concerns. Indovina replied the same day that he had not met with the employees because Birch was waiting until the contracts were received and signed.
On November 28, Kramer emailed Fisher, wanting to know if Cupp had any liens. Creek was cc’ed in the email.

Interference with the sale

On November 16, Scott Simmons sent two emails 19 minutes apart to Cowart.[6] The first email said, “I just learned Gil sold out to Walgreens.” The second one said, “The purchase amount $1.2 mil, not sure how this would cover the fraud but at least it will capture a portion.”
Cowart noted in her log on November 16 that she forwarded Simmons’s email to in-house counsel Andy O’Brien and left a detailed message for Assistant U.S. Attorney Cytheria Jernigan. She contacted Jernigan because she “just wanted action takenf.]” Jernigan never called her back.
When she did not hear from Jernigan, Cowart called FBI Special Agent Jared Medaries on November 20. This is also reflected in her log. Cowart left a detailed message for Medaries, who was investigating Birch and Cupp at the time. She noted in her log on November 26 that she talked |9to Medaries on that day and they discussed that they needed to know the details of the purchase. She also wrote in her log that she told Medaries that she had a contact at Walgreens, but was not going to discuss the matter -with him because she did not want to put Blue Cross in a position of liability. According to Cowart, Medaries told her that he thought Blue Cross probably had an obligation to share the information with Walgreens out of public safety concerns regarding contaminated drugs getting into Walgreens’ inventory, but he understood her concern and would have a conversation with Wal-greens’ management to learn more about the sale. Cowart noted that she then called Ed Svihra, director of pharmacy loss prevention with Walgreens. She told him that Walgreens had recently purchased a mom and pop store in Louisiana that was under a criminal investigation involving the FBI. She asked him to speak with Medaries and gave his contact information to Svihra. She then called Medaries and gave Svihra’s contact information to him. She concluded that she notified O’Brien of the conversation.

The aftermath

On December 1, Creek emailed Lehman. She told him to contact Jones and let him know that “we are unable to move forward at this time due to the pending actions *867 against his client. When these issues are resolved, specifically the 3 pending complaints — Blue Cross, Express Scripts, and the Louisiana State Board of Pharmacy— we would be willing to reopen our discussions.” Lehman let Jones know on December 3.
l10On January 11, 2008, Birch and Cupp entered into consent agreements with the BOP to plead no contest to the charges. Birch’s pharmacist license was suspended and he was ordered to pay $400 in costs. In order to have his license restored, Birch was to serve a minimum of one year of his suspension; he was not to have any pending criminal matters against him or violate or be found guilty of violating any local, state, or federal pharmacy laws or laws regarding controlled dangerous substances and he was not to have any pending criminal matters against him in any jurisdiction; and he was to undergo an evaluation by an addictionist approved by the BOP and receive a favorable recommendation to return to the pharmacy practice.
Cupp’s pharmacy permit was suspended for five years, with the period suspended and the permit placed on probation. Conditions of probation were that Cupp would not violate or be found guilty of violating any federal, state, or local law or regulation related to the practice of pharmacy or controlled dangerous substances, and that Cupp would upgrade its electronic record keeping system and secure the prescription department as required by law. Cupp was to pay a fine of $25,000, administrative costs of $250, and investigation costs of $5,592.81.
Jones notified Lehman by email on January 11, 2008, that the BOP proceeding had been completed. Jones emailed Lehman four days later asking him to acknowledge receiving the earlier email. Lehman replied that he would be unable to move forward on anything until he spoke to Indovina, who was on vacation until January 21, 2008. Jones replied to InLehman on January 16, 2008, that he would prepare an updated prescription count so Lehman would be in a position to respond as soon as Indovina returned. Jones emailed the updated prescription count to Lehman the following day.
On January 31, 2008, Jones wrote to Lehman, stating that he was withdrawing their offer because he was taking Lehman’s lack of response as a rejection of Birch’s offer. On February 5, 2008, Lehman emailed Jones that he was returning all of Cupp’s information. Lehman stated that he did not return Jones’s call because he figured Jones would not like what he had to say. He added that he was able to convince his boss to increase the offer slightly, but it was probably not enough for Birch to sell. The “final, final” offer was $500,000 for the prescription files. Walgreens would not purchase any of the inventory, and would not offer employment to Birch.
On February 5, 2008, Lehman sent Jones an email offering $500,000 for the prescription files. Birch instructed Jones to flatly reject that offer. According to Birch, there was no other conversation with Walgreens until April of 2009. Wal-greens purchased Cupp’s files in October of 2009. Walgreens agreed to pay $750,000, but the amount was ultimately reduced to $670,000 because of a decrease in the prescription count. Walgreens was no longer interested in purchasing his institutional business. Simmons ended up with some of his institutional customers.

Amended petition

Cupp amended its petition after first learning of Cowart’s call to Svihra while taking depositions in September of 2008. Cupp added Scot [^Simmons, Sterling Pharmacy, LLC, and Sterling Associates, Inc. as defendants. Cupp contended that Blue Cross and Simmons conspired to stop *868 the sale of Cupp to Walgreens, and that their actions constituted unfair trade practices. and were unlawful interferences with contracts and business relations.
The claims of tortious interference with contracts and business relations were ultimately dismissed on exceptions of no cause of action. The only claim against Simmons and Sterling, the LUTPA claim, was later dismissed on summary judgment.
On May 23, 2013, Cupp amended its petition to delete its allegation that Blue Cross wrongfully terminated it as a participating provider. Cupp retained its allegation that Blue Cross committed an unfair trade practice and violated La. R.S. 51:1401 et seq. by stopping the purchase of Cupp by Walgreens.
Cupp and Blue Cross proceeded to trial by jury on the LUTPA claim. The jury found that Blue Cross’s conduct by Kan-dyce Cowart with regard to the sale of Cupp to Walgreens offended established public policy and was either (1) unethical, (2) oppressive, (3) unscrupulous, or (4) substantially injurious. The jury further found that Cupp suffered damages or losses caused by Blue Cross’s unfair trade practice. The jury awarded attorney fees and $185,000 in damages.
A final judgment in accordance with the jury verdict was prepared by Jones and was signed and filed on August 8, 2013. It provided that the amount of court costs and attorney fees would be determined by the trial |lscourt pursuant to a post-trial hearing. A supplemental judgment setting forth costs and attorney fees was signed and filed on November 8, 2013.
Blue Cross has appealed both judgments. Cupp has answered the appeal.
DISCUSSION

LUTPA violation

Blue Cross contends that the jury was manifestly erroneous in finding that Co-wart’s disclosure to Svihra violated the LUTPA.
 An appellate court may not set aside'a'trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Dept. of Public Safety & Corr., 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
|HThe LUTPA is set forth in La. R.S. 51:1401 et seq. La. R.S. 51:1405(A) declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
A private right of action is provided in the LUTPA. La. R.S. 51:1409(A) states, in part:
Any person who suffers any ascertainable loss of money or movable property, ■corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, *869 act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs[.]
Acts constituting unfair or deceptive trade practices are not specifically defined in the LUTPA but are determined on a case-by-case basis. Johnson Const. Co. v. Shaffer, 46,999 (La.App.2d Cir.2/29/12), 87 So.3d 203; Tyler v. Rapid Cash LLC, 40,656 (La.App.2d Cir.5/17/06), 930 So.2d 1135. Generally, acts which constitute unfair trade practices involve fraud, deception, misrepresentation, breach of fiduciary duty, or other unethical conduct. Action Revenue Recovery, LLC v. eBusiness Group, LLC, 44,607 (La.App.2d Cir.8/19/09), 17 So.3d 999.
To prevail on a LUTPA claim, the plaintiff must show that the alleged conduct “offends established public policy and * * * is immoral, unethical, oppressive, unscrupulous, or substantially injurious.” Cheramie Servs. Inc. v. Shell Deepwater Prod. Inc., 2009-1633, p. 10 (La.4/23/10), 35 So.3d 1053, 1059.
 The range of prohibited practices under LUTPA is extremely narrow. Cheramie, supra. As the supreme court has explained:
LUTPA does not prohibit sound business practices, the exercise of permissible business judgment or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a-business must do: make money.... Finally, the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.
Id., 2009-1633, p. 11, 35 So.3d at 1060, quoting Turner v. Purina Mills Inc., 989 F.2d 1419, 1422 (5th Cir.1993).
Cowart has known Simmons since 2002 when he worked with her and the Louisiana State Police to bring criminal charges against one of his employees for filing fraudulent claims. Although she initially described Simmons as only a good business friend, emails they had.exchanged over the years showed they had more of a typical friendship than just a business friendship.[7]
Simmons was a competitor of Birch for institutional business, which Cowart knew, but she never thought calling Walgreens could help Simmons.[8] Cowart initially denied that she had helped Simmons in the past develop new business. However, records showed that on July 1, 2005, Simmons emailed Cowart about his pharmacy becoming the mail order [,(¡provider for Blue Cross-insured employers. Cowart explained that she did not understand what Simmons wanted in the email, so she referred him to a Blue Cross employee in Ruston. On August 18, 2005, Simmons sent Cowart an email that he had sent that employee about his proposal. Cowart replied the next day wanting to know how everything had progressed.
*870 Cowart regarded Simmons as someone who looked at the world the same way she did, seeing a right and a wrong with nothing in between. She thought that their friendship did not change the fact that he was an honest businessman who had reported wrongdoing to her over the years.
Cowart made no effort to determine if Simmons’s two emails were accurate before she acted on them. She felt she had no reason not to trust Simmons, who had been a reliable source of information. The first email was very upsetting to her and she believed it needed to be acted upon immediately as a matter of public safety in case contaminated drugs,from Cupp ended up in Walgreens’ inventory. She did not check to see if Walgreens was actually buying Cupp drug inventory, and it never occurred to her to determine if the sale had already taken place.
Cowart stated another reason that she called Svihra was to prevent the destruction of documents that could be useful in the original lawsuit between Cupp and Blue Cross as well as in a pending criminal investigation. Although the preservation of documents was not mentioned in her log, Cowart stated that she listed only her primary concern, which was public safety.
117Cowart called Assistant U.S. Attorney Jernigan first because she thought that Jernigan could determine whether the sale was good or bad and whether something ought to be done about it. Although Jer-nigan did not return her call, Cowart was undeterred because Jernigan was new and did not know Cowart.
When she did not hear from Jernigan, Cowart called Agent Medaries on November 20 and left him a detailed message. Medaries knew Cowart from when she had provided information to him in July that led him to open a criminal investigation of Birch and Cupp. In the course of the investigation, he spoke to Cowart a few times, conducted a few interviews, and took other investigative steps. In 2009, another agent closed that file without bringing charges after Medaries left the white collar crimes section.
Cowart was not sure if Medaries returned her call on November 26 or she called him again. According to Cowart, Medaries told her he thought Blue Cross had an obligation to provide the information to Walgreens, and he agreed to talk to her contact at Walgreens. Medaries did not remember telling Cowart that he thought there was an obligation to share the information with Walgreens. He added that if did tell her that, then he said it as an opinion and not as a fact. Cowart thought the best way to handle the situation was to put Medaries and Svihra in contact with each other.
Medaries did not remember the specifics of their conversation on November 26. He did not recall: (1) telling Cowart that they needed to know the details of the Walgreens purchase, (2) telling Cowart that he understood her concern and would have the conversation with Walgreens, |1R(3) telling Cowart it would be a good idea to call Walgreens, or (4) Cowart asking him to talk to someoné at Walgreens. Under FBI regulations, he was not allowed to call Walgreens about the matter, and if someone from Walgreens had called him, he would have had to clear it with a supervisor and possibly in-house legal counsel before he could discuss the matter with Walgreens. In any event, nobody from Walgreens ever called him.
Despite her belief there was an immediate threat of harm to the public, Cowart stated that when she called Svihra, she did not discuss details, mention Cupp by name, or share her concerns about contaminated inventory with him. She hoped he would learn this from Medaries. Cowart thought *871 she could avoid liability if all she did was tell Svihra to contact Medaries.
Svihra, who knew Cowart from conferences, remembered that Cowart called about another subject, and in the course of the conversation, she told him that she had heard that Walgreens was looking at an acquisition in Louisiana and there may be some concerns with it. He could not remember what she said the concerns were or if she mentioned a criminal investigation, but she asked if he would speak to Medaries if he called. Svihra believed that Cowart identified the pharmacy in question.
Cowart thought it was risky for her to contact Walgreens directly, but h'er grave concerns about public safety far outweighed the risks. She said she was concerned about Blue Cross’s liability since they were already being sued by Cupp, but she was not trying to stop the sale because she thought it had already occurred. Nevertheless, she knew the call to 11 ¡Walgreens could be detrimental to the sale. She testified that one of the liabilities that she was concerned about was if the sale fell apart because of her call, Blue Cross would be liable for damages.
Cowart, who wished that she had prose-cutorial powers, admitted that she wanted to see Birch go to jail and pursued getting criminal charges against him from May to November. She began making phone calls to law enforcement agencies concerning Cupp as she was driving home from Cupp’s inspection. She arranged at least a dozen meetings with law enforcement agencies about Birch and made hundreds of phone calls. She ended up taking her complaints against Cupp to at least six agencies.[9] She considered herself as consulting on the prosecution of Birch. For his part, Simmons assisted her in building a criminal case against Cupp by continuing to provide information to her.[10]
Cowart, who has investigated fraud for Blue Cross for 15 years and has worked on about 12 pharmacy investigations, admitted that she had not had a similar level of involvement in any other investigation as she had in the Cupp investigation. Despite her requests, no agency ever obtained a search warrant of Cupp. More significantly, no agency brought criminal charges against Cupp. The FBI closed its investigation in 2009.
Cowart claimed that she had legitimate business reasons for calling Svihra, with those reasons being patient safety and preservation of documents. Nevertheless, she never followed up to see if Svihra and 12nMedaries had made contact with each other. Svihra believed that Cowart’s call was the only time he has received a call from an insurer expressing concerns about Walgreens buying a pharmacy.
Latisha Fleming was the manager of the financial investigations office at Blue Cross and Cowart’s direct supervisor. Fleming was involved with Blue Cross’s investigation of Cupp from a supervisory perspective. Fleming had no problem with Co-wart making the call because there was possible patient harm from contaminated inventory. Fleming admitted that she would try to act quickly if she possessed information about a situation that she truly believed posed an immediate danger to public safety. Nevertheless, Fleming stated that Blue Cross had no legal duty to call Walgreens, and Blue Cross’s policy *872 was not to disclose investigations to third parties that are not a part of a case unless there is a need to do so.
Michele Calandro has been the general counsel for Blue Cross for 17 years. She thought that in terms of patient safety, it would have been better for Blue Cross’s insureds if Cupp had been sold to Wal-greens in December of 2007. Even Co-wart admitted that the sale taking place in 2007 may have been a good thing if the bad conditions at Cupp would have come to a halt.
Milam Ford has been the vice-president of pharmacy services for Blue Cross since 2007. He testified that Blue Cross’s policy is that employees should not discuss sensitive matters with third parties, and he considered a criminal investigation to be a sensitive matter. Ford said he could not think of one legitimate reason why Coward called Svihra since the sale of Cupp had nothing to do with Blue Cross and punishing Cupp was 12i not a concern of Blue Cross. He added that just because he could not think of a legitimate reason did not mean that one could not exist, and he trusted Cowart to know with whom she should discuss fraud cases. Ford stated that Blue Cross had nothing to gain or lose if Cupp had been sold in 2007.
Cowart said she panicked when she got the first email, and all she could think of was she had “to stop this” to protect the people of Ruston from the contaminated inventory. Yet, despite her professed sense of urgency, she waited 10 days to contact Svihra. This was more than adequate time for her to test the accuracy of Simmons’ statement. The explanation that she did not want to act on her own at first but wanted to ask Jernigan or Medar-ies what to do is, in this court’s view, unbelievable. Moreover, by her own account, she was vague in what she told Svihra. Certainly someone who was panicking and worried about immediate harm would have been more direct with Svihra.
Cowart acted to help Simmons, whom Birch believed would have had a harder time than Cupp competing with Wal-greens. It is also noteworthy that she never told Svihra that she was the person who initiated the criminal investigation of Birch and Cupp.
Cowart contended that she thought the sale had already taken place when she called Svihra, but she still wanted to stop the effects of the sale. Even if that was the case, and assuming that Walgreens had purchased the inventory as she feared, her disclosure would have still affected the sale in the sense that Walgreens surely would have sought a reduction in price and/or damages for receiving what it thought was damaged inventory.
122Gnided by her zeal to punish Birch, who was a business competitor of Simmons, and without any legitimate business reason, Cowart acted with reckless disregard for how her actions could harm Birch’s business. Accordingly, we find no manifest error in the jury’s finding that Cowart’s conduct offended established public policy and was either unethical, oppressive, unscrupulous, or substantially injurious.

Causation

Blue Cross argues the jury was manifestly erroneous in finding that Co-wart’s disclosure was a cause-in-fact of Walgreens’ decision to step away from acquiring Cupp in December of 2007.
Svihra called Creek after getting Co-wart’s call because he felt that the acquisition team that she was heading should know about it. He told Creek that he had gotten a call from someone with Blue Cross in Louisiana and apparently there was some concern about a potential phar *873 macy acquisition in Louisiana.[11] Svihra “guessed” he told Creek which pharmacy was involved, and he thought Creek expressed some familiarity with Cupp. Svih-ra said he was uncertain if he knew the concerns about Cupp when he spoke with Creek, and he did no investigating to learn more about those concerns. Svihra never spoke with Cowart after calling Creek, and he thought Creek was the only person at Walgreens with whom he shared Cowart’s call. Svihra never spoke with anyone in Walgreens’ legal department about the call from Cowart. He did not know what Creek did with the information about Cupp.
| gjCreek, who has her office in Deerfield, Illinois, was the manager of pharmacy acquisitions for Walgreens from 2006 to 2008. Creek remembered that Svihra mentioned something about rumors and investigations, but she could not recall the details of what Svihra referred to, and she did not remember if Svihra told her where the rumors came from. Creek could not remember any specific discussion with anyone else at Walgreens about what Svih-ra had told her, but thought the information was sent to Walgreens’ legal department in order for them to ask Birch about details of the pending investigations.
Creek, who lacked the authority to terminate the deal on her own, could not recall the details of what happened between November 27 and December 1 for Walgreens to decide to back away from the deal, how the decision came about, or who was involved in making it. She also did not know who told her to send the December 1 email to the acquisitions and operations teams and when she was told to send it. She could not even remember if she drafted the December 1 email or if the language in it was given to her.
Although she remarked that investigations are never a good thing, Creek did not know if the call from Svihra had any effect on the decision to back away from the sale. She could not think of any reason to back away from the deal other than what was listed in her December 1 email. Creek did not know whether any new information had been received between November 27 and December 1, and thought it was reasonable to assume that any other significant reason to withdraw from the deal would have been | ^mentioned in her email. Creek believed that the three complaints listed in her December 1 email needed to be resolved prior to Walgreens buying Cupp’s files.
Creek did not remember if she had any conversations with Grayson about Cupp between November 27 and December 1. Grayson, who retired after 41 years with Walgreens, was the regional vice-president of store operations at the time and played a role in the attempt to purchase Cupp. His office was also in Deerfield, Illinois. When Grayson was asked if he participated in the discussion not to go forward with the deal as reflected in the December 1 email, he replied that he could not remember specific conversations, but he typically would have been involved. However, he could not recall if he instructed Creek to send the email.
Josephine Kramer was the senior pharmacy acquisition coordinator for Wal-greens in 2007. She worked in Deerfield, Illinois. Kramer thought the deal to purchase Cupp was questionable because of the BOP complaints. She recalled that Indovina recommended against buying Cupp because he felt there was a question of legitimacy in their business practices in that they were not filling prescriptions in accordance with BOP regulations.
*874 Kramer was unaware there was a criminal investigation against Birch and Cupp. She was also unaware that Cowart had called Svihra regarding Cupp, as nobody mentioned it to her. Kramer could not recall who made the decision to back off the deal, and she did not think she learned of the decision before she received Creek’s email. It was Kramer’s opinion that 12r,Walgreens decided to back off the deal in December because of the pending BOP complaints.
When determining whether the call from Cowart caused Walgreens to walk away from the second agreement, it is crucial to follow the time line of events which showed that Walgreens was well aware of the BOP complaints prior to offering a second agreement that had a lower price for the files, changed the retention bonus, and did not include employment or purchasing Cupp’s inventory.
Grayson testified that Walgreens does quite a bit of due diligence before buying a pharmacy.[12] Grayson explained that when a potential pharmacy purchase is in litigation and has complaints filed against it with a state board, someone like Indovina is dispatched to find out if the situation could affect Walgreens going forward.[13] Grayson thought he told Indovina to dig deeper than he normally would after they learned about the BOP issues because he felt that they needed to learn as much as possible.
Indovina contacted the BOP, but was told they could not discuss the matter with him because it was not yet part of the public record. Indovina thought it was around that time that Fisher asked for the BOP documents. Indovina had concerns about the BOP complaints, as they were serious. Indovina knew that if Birch’s license was affected and he could not work for Walgreens, then Cupp would not be as beneficial to Walgreens as it could have been. Indovina remarked that successful buyouts include the |Mowner coming aboard and being a champion for Wal-greens. He was also concerned about the BOP complaints regarding the inventory.
On October 30, Jones mailed the documents pertaining to the lawsuit, insurance claim, and the two BOP complaints to Fisher. Creek testified that it was reasonable to assume that Fisher would have forwarded the documents to the acquisitions team, and it is probably likely that she reviewed them at some point.
According to Grayson, Walgreens chose not to go forward with the initial purchase agreement from October because there were too many negatives. Although Gray-son could not recall what the negatives were, he thought it was too risky for the money they were paying. Grayson testified about receiving a call from Bill Hag-oort, Indovina’s district manager, that there was “just too much stuff’ there and they needed to back off.[14]
Lehman stated he called Jones around November 8 to set up a second meeting with Indovina so he could determine how many retail and institutional prescriptions there were. During that visit, Indovina went through Cupp’s prescription files, asked about the business operations, and looked at the inventory. Lehman thought it was fair to say that Indovina wanted to *875 buy Cupp and thought it would help with starting the new store in Ruston.
Lehman called Jones on November 20 to tell him Walgreens would not agree to the initial proposal. He told Jones that Wal-greens wanted to proceed on different terms.
| a7Grayson agreed that it looked like the deal in November had been properly vetted by the appropriate people at Wal-greens before the second asset purchase agreement went out because it would not have left Walgreens without a positive recommendation from the acquisitions team. He explained that although it is possible that some other due diligence matters are still being resolved when Infowerks is contacted, typically if Infowerks has been notified and the closing date is drawing near, then all due diligence has been done.
To the best of Grayson’s recollection, it was the cumulation of negative things that broke the November deal. Although Grayson considered it reasonable to think that the three items mentioned in Creek’s email were the cumulation of negative things that caused the deal to fall apart, information about a possible criminal investigation would have been significant enough to cause Walgreens to refrain from closing the deal. Grayson agreed that if a criminal investigation was what killed the deal, it would be reasonable to expect the criminal investigation to have been mentioned in at least one email.
Grayson could not recall receiving any new information between November 20 and December 1 that would have led Wal-greens to back away from the deal. It would have been normal practice for Creek to pass on to Grayson the information 'that she received from Svihra, but he had no specific recollection of hearing about criminal charges concerning Cupp.
Lehman remembered hearing someone talking about a criminal investigation of Cupp, but did not know who said it or when they said it. |2sSince he did not know in what context the phrase “criminal investigation” had been used, Lehman thought it was possible the person saying it was referring to the BOP complaints. Lehman knew the decision to step away from the deal had been made in Deerfield, Illinois, but he did not know who participated in the decision. Lehman would have considered it a negative factor if he had heard of a criminal investigation of Cupp while the deal was still pending. Since he did not know when he heard about the criminal investigation or who told him, Lehman felt he could not say whether it was a factor in Walgreens’- decision to walk away from the sale in December.
Indovina stated that he first learned of the criminal investigation at his deposition. Indovina believed that based on his not having personal knowledge of the criminal investigation, it did not affect the purchase of Cupp. Nevertheless, even though he was not involved with the decision, he did not think that the October 30 disclosures stopped the sale. Indovina did not remember Lehman or Creek saying that the October 30 information would prevent the sale.
The emails showed that Walgreens had taken many steps (including a lien search, preparing a statement for customers and employees, and bringing Infowerks in) to prepare for the closing. Grayson remarked that many times the transfer of data, which is basically the closing, is on a Saturday or Sunday so the new store can be ready when it opens on Monday. Gray-son stated that he did not think Indovina would have been working on the statement on November 29 if he did not think the deal was going to close. According to Lehman, Infowerks will normally contact *876 the bgseller two weeks before the closing date. Grayson also testified that Infb-werks is not brought in until a deal is very close.
Grayson testified that in light of the asset purchase agreement being approved by Walgreens on November 27 and sent to the Cupp, if all normal closing procedures had been done, it stands to reason that something new must have happened between November 27 and December 1 to call off the deal. Grayson thought it was highly unusual, and in his personal experience, he did not know of a case when the vice-president of store operations signed an asset purchase agreement and then the deal fell through.
Indovina testified that he had supervised the operational end of about 10 pharmacy purchases for Walgreens. He had never seen the purchase of a pharmacy that he was involved with get so far in the process as to draft an announcement to employees, but then fail to actually close the purchase. Lehman expected the deal to close as of November 29.
In Creek’s December 1 email, she referred to the pending complaints with Blue Cross and ESI, which necessarily include the lawsuit, and stated they would be willing to reopen discussion when the pending complaints were resolved. If the lawsuit was truly a factor in stopping the sale, then it would have remained a factor in 2009 when Cupp was sold to Walgreens, as it was still pending at the time.
Walgreens had several weeks after receiving the October 30 documents to decide how to act in light of the BOP complaints.. They chose to offer a new asset purchase agreement. As noted above, they took steps to | .^prepare for the sale. The only new information between November 29 and December 1 was the call from Cowart that at the very least was known by Svihra, Creek, and the legal department. Accordingly, we find no manifest error in the jury’s finding that Cowart’s call caused Walgreens to back off the deal in December.

Attorney fees

Blue Cross contends that the trial court lacked authority to amend the final judgment by quantifying and assessing attorney fees against it through a supplemental judgment. Blue Cross cites La. C.C.P. art. 1951, which states, in part, that “[o]n motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment, but not its substance, or to correct errors of calculation.”
In support of its argument, Blue Cross quotes a passage from Bourgeois v. Kost, 2002-2785, pp. 7-8 (La.5/20/03), 846 So.2d 692, 696:
Without a specific statutory grant of authority, the trial court is limited to the general authorization for amending final judgments provided in Code of Civil Procedure Article 1951. As stated above, Article 1951 limits the amendment of judgments to the correction of errors in calculation and alteration of phraseology, but does not authorize a trial court to make substantive amendments to final judgments. Courts have uniformly held substantive amendments to judgments made without recourse to the proper procedures, i.e. by way of a timely motion for a new trial or by appeal, to be absolute nullities.
On September 4, 2013, Cupp filed a motion to set a hearing date to fix court costs and attorney fees. Blue Cross filed its motion for suspensive appeal on September 5. The next day, Cupp filed an opposition’ to the motion for appeal in which it argued that the order granting an appeal should not be signed until after the amount of attorney fees were set. Cupp *877 suggested that the court take the motion for appeal under advisement until the amount of attorney fees was fixed. The appeal was granted on September 11, 2013. On October 4, 2013, the district court signed an order allowing Blue Cross to deposit a cash bond in the court registry in lieu of posting an appeal bond.
On October 4, 2013, Blue Cross filed an opposition to Cupp’s motion to set a hearing date to fix court costs and attorney fees. The hearing on the motion to fix attorney fees was held on October 24, 2013.
After the district court entered the supplemental judgment, Blue Cross filed a second motion for suspensive appeal on November 11, 2013. The appeal was granted 10 days later.
Blue Cross also argues that the district court lacked jurisdiction to quantify and assess attorney fees once the first motion for suspensive appeal was granted on September 11. La. C.C.P. art. 2088(A) pro- ■ vides:
The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal[.]
We agree with Blue Cross that the district court was divested of jurisdiction once the first suspensive appeal was granted and the cash bond was deposited in the court registry. Accordingly, we vacate the supplemental judgment and remand for a determination of attorney fees and costs.
We award attorney fees of $5,000 to Cupp for defending this appeal.
| ^Damages
Cupp has answered the appeal arguing that the damage award of $185, 000 is insufficient. Cupp points out that it would have received $900,000 under the November agreement, leaving a difference of $230,000 when considering the actual sale price of $670,000.
The price offered under the November agreement had two parts. The first part was $500,000 for the prescription record. The second part offered between an additional $200,000 to $400,000 depending on the number of prescriptions retained. Thus, it is not certain that Cupp would have received the maximum amount of $900,000 under the November agreement, as the range was $700,000 to $900,000. Accordingly, we find that the jury was not clearly wrong in calculating the damage award.
DECREE
At Blue Cross’s cost, we AFFIRM the final judgment, VACATE the supplemental judgment, and REMAND for a determination of attorney fees and costs for the trial.
CARAWAY, J., dissents with written reasons.

. Unless otherwise noted, all relevant events and communications occurred in 2007.

. The request for a preliminary injunction was denied.

. Jones emailed Russell Lehman on July 6 expressing interest in discussing the matter. Jones received a nondisclosure agreement three days later. On July 13, Jones sent Wal-greens two confidentiality agreements executed by Birch. Walgreens emailed a pharmacy questionnaire and request for supporting documentation to Jones that same day.

. Among the key elements were that Wal-greens would pay $900,000 for Cupp's files, buy Cupp's inventory at cost, offer jobs to Birch and three of his employees, pay a $100,000 bonus to Birch for completing one year of work with Walgreens, and pay a $200,000 bonus to Birch if Walgreens had retained a certain average of prescriptions per day after one year. The sale closing was to occur on November 1.

. Walgreens needed the deed to Cupp's location so it could structure the noncompetition agreement to provide the location could not be used for a pharmacy.

. The emails were also sent to an employee with the Louisiana Attorney General’s Office.

. The topics of these emails included the deaths of their sisters, holiday greetings, and Simmons’s new office.

. In February of 2006, Birch and Simmons had a dispute over business with patients at a nursing home that had been recently sold.

. Medicare fraud unit of the Louisiana Department of Justice, Drug Enforcement Agency, Special Agents for Medicare with the Department of Health and Human Services, Food and Drug Administration, FBI, and Louisiana State Police.

. For example, in June, he helped compile a list of Cupp's institutional customers.

. Svihra did not recall mentioning any criminal investigation to Creek.

.For example, Indovina visits a pharmacy to review hard copies of the prescriptions, look at the inventory, examine invoices from wholesalers, and look at third party information to verify the number and kinds of prescriptions filled.

. Grayson recalled Walgreens buying stores having state board issues.

. Grayson thought Hagoort called him in relation to the first asset purchase agreement.