Judgment rendered September 23, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,565-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

KENNETH LAWRENCE                          Plaintiff-Appellant

versus

SOUTHERN RECREATIONS,                     Defendant-Appellee
LLC D/B/A HOPE'S CAMPER
CORNER, ET AL

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 20160885

Honorable Robert C. Johnson, Judge

* * * * *

OFFICE OF ANTHONY J. BRUSCATO          Counsel for Appellant
By: Anthony J. Bruscato
    Adam Jordan Ross


COTTON, BOLTON, HOYCHICK, ET AL        Counsel for Appellee,
By: David Paul Doughty                 Frank Maxwell, Jr.


* * * * *

Before MOORE, STEPHENS, and McCALLUM, JJ.

**McCALLUM, J.**

This lawsuit involves the sale of a used motor home that sustained significant water damage. The buyer appeals a judgment denying his claims of redhibition and unfair trade practices.

For the following reasons, we affirm the judgment.

## BACKGROUND

Frank Maxwell, Jr. ("Maxwell"), is a retired general contractor and owner of Maxwell Hardware in Delhi, Louisiana. Maxwell purchased his first motor home, a new Fleetwood Providence, for $185,000 in the fall of 2005. The motor home was equipped with three "slides" which extended to increase its interior space.

Over the years, Maxwell drove the motor home to LSU home football and baseball games, the Southeastern Conference baseball championship tournament in Alabama, regional bridge tournaments, and on a family trip to Montana. When the motor home was not on the road, it was parked in an uncovered spot near Maxwell's hardware store. The motor home was never under a shed or had a tarp placed over it. Maxwell often towed a 2007 Mazda car behind the motor home.

The owner's manual ("manual") for the motor home stated that the vehicle was equipped with a new roof material called thermoplastic olefin. The manual recommended a roof inspection every three months to "maintain the weatherproof integrity" of the motor home. An area needed to be resealed if the sealant was cracked or peeling, or if there was a void or missing sealant. The roof was not inspected until 2014. The only time Maxwell went on the roof was shortly after he purchased the motor home.

The manual stated that the roof required special adhesives and materials, and warned against the use of silicone sealants. The original sealant used was a self-leveling lap sealant which was designed to bond with the vinyl roof. It was widely accepted that the lap sealant would perform as expected for no more than two or three years.

Maxwell took the motor home to Affordable RV Repairs in Monroe to have a refrigerator repaired near the end of 2013. After an Affordable employee went on the motor home's roof to check a vent for the refrigerator, he told Maxwell that the roof needed to be inspected or to have a coating applied. Maxwell could not recall exactly what was said.

In the spring of 2014, Maxwell asked Jimmy Hutchinson ("Hutchinson"), a carpenter and homebuilder who had done work for him, to apply a roof coating and to caulk the roof. After Hutchinson and his son pressure-washed the roof, he told Maxwell the roof was in excellent condition and did not need anything done. Maxwell asked them to caulk it anyway out of an abundance of caution. Maxwell did not refer to the manual to learn the recommended sealant for the roof. Instead, Maxwell provided an ordinary silicone caulk that was designed for general use. He paid Hutchinson $75 for the work.

In 2015, Maxwell, approximately 85 at the time, was urged by his son to stop using the motor home. After discussing it with his wife, Maxwell decided he would use the motor home through the 2015 LSU football season and then sell it. Maxwell went to Hope's Camper Corner in Monroe, Louisiana, to inquire about a consignment sale, and they agreed to accept the motor home after the football season was over.

Maxwell was unable to fully enjoy his motor home for that last football season. In September of 2015, the motor home's engine stopped working as Maxwell drove from a bridge tournament in Tunica, Mississippi, to Baton Rouge. When Maxwell brought his motor home to Louisiana Machinery in Monroe to determine what had gone wrong, it was discovered that rust in the fuel tank had reached the engine and ruined all the fuel injectors. It cost Maxwell over $10,000 for the engine repairs. The motor home remained at the shop until November of 2015 when Maxwell drove it to Delhi to have its interior and exterior cleaned to prepare it for sale.

Hope's Camper Corner has been operated by Lloyd Sivils ("Sivils") for 21 years. Maxwell and Sivils entered into an agreement on December 1, 2015, for Hope's to sell the motor home and the 2007 Mazda. Maxwell was to receive $50,000 from the sale of the vehicles. If the motor home was in good condition, its NADA value was $65,000. According to Maxwell, he did not know what the motor home was worth but Sivils said he could get at least $50,000 for it. Hope's would keep whatever someone was willing to pay over that amount. By the terms of the consignment agreement, Maxwell agreed to pay all costs of putting the motor home in salable condition. Sivils signed the agreement on behalf of Hope's. Maxwell left the motor home and the Mazda, along with signed titles to the vehicles. He also left a copy of the invoice for the engine repair in case a potential buyer had questions. The invoice had Maxwell's name on it.

The uncovered motor home was not parked on the sales lot at Hope's, but was parked by itself on gravel near the entrance. Neither a "for sale" sign nor an "on consignment" sign was displayed on the motor home.

In the spring of 2016, Kenneth Lawrence ("Lawrence"), who worked 40 years in concrete construction, was looking to buy another motor home after having owned a 1996 Fleetwood motor home for two years. His Fleetwood had been used primarily for hunting, and he wanted something that could be used for travel with his family. Lawrence decided to visit Hope's to look for a "real nice, well used" motor home. Sivils told him that Hope's only had Maxwell's motor home available and that it was listed at $65,000. Lawrence, who was there for no more than 30 minutes that day, walked through and along the sides of the motor home.

Lawrence returned to Hope's a few days later. During this visit, which lasted around 45 minutes, Royce Mobley ("Mobley"), a shop foreman at Hope's, started the motor home's engine and extended the slides for Lawrence. Lawrence was very happy with the vehicle's drivetrain and started becoming interested in the motor home. Lawrence did not otherwise ask Sivils or Mobley about the motor home's condition.

During a third visit, Sivils told Lawrence that the motor home engine had been repaired and showed him the repair invoice. Lawrence responded that he wanted to go inside the motor home and check the slides, air conditioner, transmission, and engine to make sure they were in working order. Lawrence was most interested in the condition of the drivetrain. Mobley went into the motor home with Lawrence to show him how to operate the slides, the air conditioner, and the generator.

Lawrence began negotiating with Sivils to purchase the motor home. He mentioned that he wanted to "trade-in" his 1996 motor home. Lawrence told Sivils that he would offer $45,000 and the trade-in for the motor home. Sivils contacted Maxwell about the offer of $45,000, and he told Sivils that

was acceptable. Maxwell also told Sivils that he would not make additional repairs to the motor home at that price.

Lawrence obtained insurance on the motor home with Progressive Insurance on March 3, 2016. The purchase, which was financed, was finalized on March 7, 2016. There was no bill of sale for the transaction.

Sivils delivered the motor home to Lawrence's home in West Monroe. Lawrence wanted to install new carpet in all areas of the motor home except the rear bedroom, but he opted to use wood flooring instead because of the cost. On March 8, Sivils purchased floor planks at Home Outlet in West Monroe for $748. He hired Timmy Worsham and his son to remove the carpet and install the planks. The Worshams began working on March 9 and stopped working on March 11. While they worked, two of the slides were extended, with shims driven under the bottom of the slides.

Between March 8 and 12, the Monroe area experienced a historic weather event ("storm") as over 24 inches of rain fell. The Worshams worked without incident on March 9 while removing carpet. Photos of the project show the Worshams had installed planks starting from the back, and no water was visible in the photos. However, after the new flooring had been installed up to an area near the front seats, the Worshams alerted Lawrence that they found carpet drenched with water. Examining the motor home's interior, Lawrence discovered that walls near the front had large blisters bubbling out of them. Lawrence claimed that water dribbled out of the blisters when he poked the blisters with a knife.

Lawrence contacted his insurer. Brian High, who writes estimates on property damage claims for Progressive, examined the motor home on March 16, 2016. Lawrence showed him the location of the damage and told

High that he did not think the damage would be a covered loss because the damage looked like it existed before his purchase. High took photos to document the damage. Based upon the wall damage observed, High estimated that the cost of repair would be $2,600. Progressive determined that it was not a covered loss.

Lawrence called Sivils about the water damage. Sivils referred Lawrence to Maxwell. Maxwell invited Lawrence to his house. Lawrence showed Maxwell photos of damage to the floor, a cabinet above the door, and an area behind the driver and passenger seats. Maxwell told Lawrence that there was only collision coverage on the motor home. Maxwell then reached out to a friend named Loftin to see if he could repair the damage. No repair cost was discussed at the time. According to Lawrence, Loftin never contacted him. Maxwell recalled that Lawrence never contacted Loftin.

Lawrence claimed that he called Maxwell a few days later and offered to pay half the cost of repairs, but Maxwell refused. Maxwell did not recall that conversation and denied that Lawrence offered to pay half the cost of repairs. Maxwell claimed that he did not know the cost of repairs until the first day of trial. Maxwell testified that he would have paid for part of the repairs back then if Lawrence had asked, but was no longer willing to do so. Jeffrey Alford, a business and safety coordinator for Service First, went to the motor home on March 21, 2016, to take air samples and look at the water damage. Results of the air samples showed high levels of a type of mold caused by wood decay.

The motor home has remained at Lawrence's home without moving from its concrete pad since the day it was delivered. Initially, Lawrence

covered the motor home with a tarp, but eventually removed it because the tarp made it difficult to enter the motor home to run the engine. Lawrence has continued insurance coverage on the motor home. He also spent around $1,000 to replace the batteries in the motor home.

Lawrence refused to give the title for the trade-in to Sivils and went to Hope's to retrieve the trade-in. Lawrence sold the trade-in for $6,000. Sivils sold the Mazda tow vehicle for $7,200 and kept the proceeds.

## LAWSUIT & TRIAL

Lawrence filed suit against Southern Recreation, L.L.C. d/b/a Hope's Camper Corner, Sivils, and Maxwell within a month of the sale of the motor home. He alleged that he would not have purchased the motor home had he known or been told that the roof leaked. He prayed that the court set aside the sale on the basis that the motor home contained a redhibitory defect. He also sought damages for what he alleged were unfair trade practices.

Southern Recreation and Sivils settled with Lawrence, leaving Maxwell as the remaining defendant. A bench trial was held in this matter over three days in 2019.

### Lack of maintenance

Maxwell claimed that he was unaware of the recommendations regarding maintenance of the roof through regular inspection and resealing. When asked about the recommendation that all exterior openings and roof components be resealed as necessary, he responded that resealing the roof was not needed. He took care of any problems as they arose, and he did not think it was necessary to pay attention to the roof since he never had any roof leaks. The only water that he saw entering the motor home was when a

small amount of water would sometimes come in when the slides were opening or closing.

Maxwell testified that he never saw any indications of water leaks in the ceiling or on the walls when he was last in his motor home at Hope's on December 1. There were some water stains near the slide on the driver's side, but he assumed they were from water that had entered while he operated the slides.

Maxwell could not remember exactly what the Affordable employee told him in 2013 about the roof. Maxwell denied he was asked if the roof had ever been resealed. He did not ask the employee why he thought the roof needed to be inspected or cleaned, or ask about the cost to reseal it. He also denied that the employee mentioned anything about the sealant around the joints being cracked. Maxwell did not ask the employee what would happen to the roof if he did not do what Affordable suggested. Maxwell testified that other than the comment about the roof needing to be inspected or cleaned, he did not discuss the roof at Affordable.

When Maxwell hired Hutchinson to work on the roof, he did not check with the manual before choosing the silicone caulk for the job. Even though he doubted Hutchinson had ever been on the roof of another motor home, he assumed that Hutchinson would know how to caulk it properly since he was a carpenter. Unlike the recommend sealants, silicone caulk was not designed to bind with the vinyl roof. While the silicone would reduce the amount of water penetrating the roof if there was a leak at a roof protrusion, it would not stop the leak.

*Hope's*

Maxwell did not mention the roof caulking done by Hutchinson to Sivils because he did not think it was important. Sivils never asked Maxwell if the roof had been resealed or inspected. Maxwell believed the motor home was in salable condition when he left it at Hope's. Sivils testified that he would have given the motor home a "7" if grading its condition on a scale of 1-10.

Nobody at Hope's conducted a thorough inspection of the interior or roof of the motor home at any time while it was offered for sale. Sivils observed wear and tear in the interior as well as a few spots around the door, but he did not see anything else wrong with the walls or ceiling during the few times he entered the motor home. Sivils never saw any indication that the motor home was leaking from the slides or roof. He did not notice any musty or moldy odor or anything else indicating a moisture problem. Mobley never saw anything on the walls indicating a roof leak while the motor home was at Hope's. He never noticed a musty or mildew smell.

Sivils testified that Lawrence never asked about the condition of the motor home, and he did not represent its condition to Lawrence. Sivils added that if Lawrence had asked about its condition, he would have answered that he did not know.

Lawrence testified that he never noticed any visible water damage on the interior of the motor home during any of his three trips to Hope's before buying it. He thought the motor home's interior looked nice, albeit with a little wear and tear. Lawrence did not have the motor home inspected before his purchase. He testified that since Hope's was a reputable company, he

just accepted that it was a nice motor home and expected Hope's would tell him if something was wrong with it.

Lawrence claimed that in their discussions before the sale, Sivils would refer to an owner without mentioning Maxwell by name. He testified it was not until he was at the bank for the closing and Sivils told the bank to make the check payable to Maxwell that he learned that Maxwell was the actual owner. Sivils claimed that he told Lawrence upfront that the motor home did not belong to Hope's but was owned by Maxwell. It was not until Lawrence contacted Maxwell after the sale that Maxwell knew that Lawrence had purchased his motor home.

Maxwell testified that he did not know about Lawrence's trade-in until after the lawsuit was filed because Sivils had only told him the amount of the proceeds that he would receive. He also did not know until after the lawsuit that Sivils sold the Mazda for $7,200. Maxwell testified that he was happy and satisfied to get $45,000 from the sale because he was ready to sell the motor home and did not know what it was worth.

According to Maxwell, when Sivils contacted him about Lawrence's offer of $45,000, it was the first time he had heard from Sivils in three months. Maxwell contended that he told Sivils to accept the offer but with an "as is" condition. The consignment agreement between Maxwell and Hope's was amended to state "agreed $45,000" but the "as is" condition was not documented on the agreement. Sivils explained that there was no need to document it since Lawrence would not see the agreement.

Sivils testified that he told Lawrence the offer was acceptable for the motor home in "as is" condition. Lawrence denied that the term "as is" was

10

ever used with him, and he added that he would not have purchased the motor home if he knew that was a condition of the sale.

***The storm***

Lawrence described "buckets full" of water coming down the walls during the storm. He believed the leak was coming off the roof and then down the walls. Lawrence testified that the water damage he saw after the Worshams raised the alarm was in the front of the motor home. Lawrence walked to the rear but did not see water coming through and water was not on the carpet. Lawrence also testified that he did not see water coming into the middle part of the motor home. The elder Worsham was deceased at the time of trial.

The walls in the motor home were thin pieces of plywood with a vinyl wallpaper attached to the front of them. Lawrence believed the wood was already rotten when he bought the motor home, but the damage was concealed behind the wallpaper.

Brian High from Progressive Insurance testified that the damage he observed between the slide and the driver's seat looked like rot to him and not something that occurred during the policy period. High also saw damage to slide molding, a wall, an area behind the driver's seat, and an area above the driver's side window. High thought all this damage predated coverage. High did not consider it strange that one of the first things that Lawrence told him when they met was that the damage was pre-existing.

High explained that wet wood can dry out, but dampness over a period of time will cause rot. He added that based on his experience, thin plywood does not rot very quickly. After looking at the roof and the condition of the seals, High thought the roof was the source of some of the

11

water. High believed it was possible that the water had leaked from the slides themselves. However, he thought the slides were in their proper place and position.

High provided a damage estimate for what he observed. However, he did not open the cabinet doors to look for damage, and no damage to the shower room was pointed out to him. High explained that a teardown needed to be done in order to determine the full extent of damage.

Jeffrey Alford went to the motor home on March 21 to take air samples and check the water damage. He did a visual inspection of the forward compartment and found water stains on both the driver and passenger sides. Alford believed that areas along the wall that were above and behind the passenger and driver seats showed signs of long-term water damage. While he could not put a timeline on the water damage because different types of wood have different reactions to moisture, he did not think it was something that would have happened over a couple of days. His definition of long-term would be over at least three weeks. However, Alford could not say one way or the other whether the damages that he saw existed before the storm. Alford also testified that water damage from a substantial rain two to three weeks before his inspection could be considered long-term damage.

*The experts*

The trial court was presented with testimony from two experts who possessed much experience working on motor homes and other recreational vehicles ("RVs"). Royce Mobley ("Mobley"), who was employed as a shop foreman at Hope's, testified on behalf of Maxwell as an expert in RV roof repairs, inspections, and reconditioning, and in general maintenance of RVs

12

and motor homes. Mobley had gone over some of the motor home's functions with Lawrence before his purchase. Cody Searcy ("Searcy"), who supervised shop technicians at Clay's RVs in West Monroe, testified on behalf of Lawrence as an expert in all parts of a motor home other than the drivetrain.

Mobley and Searcy described the design of the roof in detail, including how there was a barrier within the roof which prevented ceiling stains by channeling water to the walls and floor. The motor home had a honeycomb roof made up of aluminum rafters, molded Styrofoam, and thin wood decking.

Mobley looked at the motor home's roof and interior on December 22, 2016, and on March 21, 2017. He agreed that he would expect a roof to look horrible if it had gone nine years without an inspection or resealing. While he did not do a full inspection of the roof, he thought its condition was appropriate for a vehicle of its age. Mobley found the wood decking in the roof to be structurally sound.

Mobley testified that in his experience it does not take very long for wood exposed to moisture to start breaking down. He believed that wood can deteriorate within a week depending on the type of wood and how wet it got.

When he looked at the motor home after the lawsuit was filed, Mobley noticed there was a gap along the sides and at the top of the slide on the driver's side. The gap became wider as it moved up the slide. Daylight could be seen through this gap from inside the motor home. Mobley contended there should not have been a gap if the slide was sealed properly. He testified that the flooring work caused the top of the slide to tilt out,

which meant the slide's seal did not work properly. Shims were used to raise the slide while the floor was installed, and following the floor installation, the slides were never adjusted to accommodate the new floor which was higher than the carpet. Mobley explained that the slides had to be adjusted for the bubble gasket seals to fully compress and to function as intended. He added that a slide that is not properly adjusted can allow water to enter whether the slide is opened or closed.

In Mobley's opinion, water damage to the interior was caused by the lack of roof maintenance and from the gap created along the slide. While he could not give percentages for how much either factor contributed to the damages, he believed that a slide that far open would allow a great deal of water to enter during a heavy rain.

Mobley explained that even if there were cracks in the sealant on the roof, water would not have come down the walls in "buckets" as described by Lawrence. However, the gap along the slide would have allowed water to enter and flood down the wall in "buckets." Mobley thought it was the most logical explanation for why Maxwell never saw a leak. Mobley did not examine the opposite slide on the passenger side closely.

Searcy looked at the motor home twice. His first visit was on April 16, 2018, when he performed a full physical inspection of it. Searcy characterized the inspections done by High and Mobley as being more visual in nature. Searcy's second visit was to give a damage estimate.

Searcy explained that a roof inspection every 90 days is necessary in order to look for web cracks on the surface of the sealant. Left untreated, these web cracks will become deeper until they create a void. The silicone apparently preserved the appearance of the sealant beneath it. Searcy

14

thought that the sealant's appearance did not change from the time the silicone was applied until he removed the silicone during his inspection. Thus, he believed the sealant was as dry and cracked in 2014 as it looked in 2018.

When Searcy removed the silicone from around the skylight above the motor home's shower, he found a hole large enough that he could almost put his thumb through. Although the skylight crack was the most significant, he also found large cracks around nearly every other roof protrusion when he pulled up the silicone.

Searcy thought what he found around the shower skylight showed the nature and extent of the water damage. There was mold on the Styrofoam and the decking there was completely rotten. The skylight was held in place by water-resistant screws which had deteriorated. Some of the screws no longer had threads. Searcy believed it would take at least five years of exposure to moisture for the screws to deteriorate in that manner. Searcy also believed it was more likely than not that water from the outside left the screws in that condition. The shower was located toward the middle-back portion of the motor home. Searcy thought that possibly some of the water coming through the skylight crack went in the shower and some went down the side.

Searcy disagreed with Mobley about the role the slide played in the water damage. He thought the slide was sealed properly while the planks were being installed even with the slide moved up a little bit by the shims. He also dismissed the significance of the gap that Mobley had seen earlier. Searcy thought it was caused by the slide not being brought in all the way, and not by any adjustment issue. He added that light can be seen between

15

the gasket and the slide in any slide that is partially open. He found that the slides sealed properly when he operated them and they were not out of alignment. He found no reason for the slides to need adjustment since he believed that the new floor was lower than the carpet it replaced, so it would not cause the slide to tilt up.

In Searcy's opinion, based on the lack of inspections and proper sealant being reapplied while Maxwell owned the motor home, it was more likely than not that rain entered the motor home's interior prior to March 7, 2016, and caused extensive damage. He also believed that it was more likely than not that water penetrated the motor home wherever there was a roof protrusion. Searcy acknowledged that if he had not seen the sealant's condition or the photos taken by High, he would have had reservations about giving an opinion on the condition of the motor home at the time of sale since he did not inspect it until two years later.

Searcy testified that there was no way that the wood would look as it did in High's photos after only two weeks of water penetration. Searcy also testified that he was able to press his finger through the motor home wall to the outer layer. When it was pointed out to him that Lawrence was able to do the same during the storm, he replied that it would take more than a couple of days of deterioration for Lawrence to be able to do that.

Searcy thought the majority of the damage was done to the front of the motor home, but he did find water damage to the rear of the interior. He did not recall seeing much damage to the walls in the middle, although there was water damage around the slides. He found the entire front area of the motor home was rotten. Searcy testified that it would cost $10,000 to $15,000 to repair the interior, with most of that for the damage to the front.

16

He explained that repairing water damage to the interior involves gutting it, and it is almost impossible to find matching paneling if a motor home is older than ten years.

Searcy anticipated that it was more likely than not that the remainder of the underside of the roof was in similar condition to what he saw around the skylight. He explained that while the roof felt structurally sound when he walked on it, that was because of its honeycomb structure. He thought the roof was in need of complete replacement at the time of the sale based on the evidence at trial and the condition of the sealant. The cost to replace the roof would be $9,000 to $13,000, which would cover pulling the vinyl off the roof, putting down new decking, and sealing the roof. In sum, Searcy thought it would cost roughly $20,000 to repair the motor home.

Searcy was confronted at trial with his deposition testimony from September of 2018. Searcy had then testified that he could not offer any testimony as to the condition of the wood paneling and roof at the time of sale. He also testified that he was not going to offer a damage estimate at trial. When asked at his deposition what it would take to repair the roof, he answered that it would cost between $800 and $1,300 to clean and reseal it. At trial, Searcy explained that this estimate was what it would cost to stop the roof from leaking, not to fully repair it. He also explained he was only asked for an opinion on the damages and not an estimate at the time of his deposition. He had done only a rough estimate by then, but did not bring it to the deposition.

A photo in evidence showed scratches on the new floor in front of a slide. Mobley thought the scratches were from the slide dragging across the new floor and was an indication that the slide was out of adjustment. He

17

explained that the slide was moving across at a different height and scraping the floor. Lawrence denied that the photo showed scratches, but said it merely looked like sunshine on the floor in the photo. Searcy thought the scratches could have been made by a staple or screw being caught under the slide, and believed the scratches had nothing to do with any alleged misalignment of the slides.

## JUDGMENT

On July 3, 2019, the trial court rendered judgment dismissing Lawrence's redhibition and unfair trade practices claims. Lawrence appealed the judgment.

The trial court provided oral reasons for denying the unfair trade practices claim at the conclusion of the trial on May 1, 2019. The trial court found that Lawrence failed to prove a violation of the Louisiana Unfair Trade Practices Act ("LUPTA") by a preponderance of the evidence. There was no evidence that Maxwell tried to be deceitful, misrepresent anything, or engage in any type of fraudulent conduct when trying to sell the motor home.

The trial court noted that Maxwell was on notice in late 2013 that there may be a problem with the roof and he knew that he had not maintained it in accordance with the manual. He tried to address the issue, albeit with silicone caulk. However, there was no indication to him that the roof was leaking. Moreover, no damage was noticed by Sivils, Mobley, or Lawrence when the motor home was at Hope's. In light of the testimony as a whole, the trial court could not find any effort by Maxwell to defraud anyone or be deceptive. It was noted that Maxwell had volunteered the information about the engine work to Sivils.

18

On June 26, 2019, the trial court provided oral reasons for denying the redhibition claim. It concluded: (1) Maxwell was a good faith seller; and (2) Lawrence failed to prove by a preponderance of the evidence that there was a redhibitory defect on the date of the sale that rendered the motor home useless or unfit for the purpose for which it was purchased.

The trial court determined that Maxwell's testimony that he never noticed water damage to the walls or anything indicating major damage to the roof was corroborated by Sivils. Moreover, Lawrence himself did not notice any water damage, stains, mold, mildew, or musty odor.

The trial court concluded that while some water came into the motor home, a lot of the water probably came in as a result of the flooring work being done during the storm. The court did not think it was sensible to install the new floor at that time.

There was nothing in the record, including Mobley's and Searcy's testimony, which aided the court in determining the nature and extent of the alleged redhibitory defect on the date of the sale. There was no credible evidence to substantiate that the alleged redhibitory defect manifested itself within three days of the purchase. The trial court stated that the mere fact that there might have been slight damage to the roof, not visible to anyone and not noticed by Lawrence, Maxwell, or Sivils, did not make it a redhibitory defect.

The trial court found Maxwell to be a credible witness who disclosed what he knew based on his visual observations. The trial court did not find Searcy to be entirely credible. The court considered Searcy to have been truthful when he testified at his deposition that it would take no more than $1,300 to repair the roof and he did not know if it was necessary to repair the

entire roof. However, the court did not find Searcy's trial testimony that the roof repair would cost at least $9,000 to be credible.

The trial court found that Sivils told Lawrence that it was an "as is" sale, and that if Lawrence had any concerns about it then he should have taken whatever precautions a reasonable person would have taken under the circumstances. The trial court also found that Lawrence failed to act as a prudent administrator by not covering the motor home or getting the roof repaired. Lawrence could have used some of the $6,000 that he received from the sale of the trade-in to fix the roof and/or repair some of the interior damage instead of allowing the motor home to further decay.

## DISCUSSION

### *Redhibition*

A warranty against redhibitory defects in things sold is set forth in La. C.C. art. 2520, which states:

> The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
> A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

The warranty against redhibitory defects covers only defects that exist at the time of delivery. The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time. La. C.C. art. 2530.

Lawrence argues on appeal that the trial court erred by confusing existence of a redhibitory defect with the occurrence of damages from the defect. Lawrence maintains that it was obvious from the evidence that on the date of the sale, the motor home had the redhibitory defect of a chronically leaking roof because of poor maintenance. Lawrence contends that it was not necessary for him to prove that a substantial amount of the damage occurred prior to the sale. He further contends this error was compounded by the court's manifest error in crediting Maxwell's testimony that there was no leak on the date of delivery. Lawrence also maintains the trial court erred in giving weight to the alleged "as is" condition.

The existence of a redhibitory defect is a question of fact and should not be disturbed on appeal in the absence of manifest error. *Blair v. Bad Boy Inc.*, 48,953 (La. App. 2 Cir. 4/9/14), 137 So. 3d 1223.

An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Cole v. State Dept. of Public Safety & Corr.*, 01-2123 (La. 9/4/02), 825 So. 2d 1134; *Stobart v. State through Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993).

To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart*, *supra*. Even if an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Cole*,

21

*supra*; *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). Moreover, where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell*, *supra*. The trial judge, in the present case, specified much in the realm of factual determinations and the weighing of witness credibility.

The timing of water damage is properly part of the inquiry into whether there was a redhibitory defect at the time of delivery. This is so because absent someone going on the roof to examine it, water penetration would be the primary indicator that the roof may be defective. The evidence established that the original roof sealant for this 2005 motor home would have been fully effective for only a few years. The silicone caulk applied at Maxwell's direction in 2014 would have reduced the amount of water leaking through a crack in the sealant, but it would not have sealed the leak. The roof would have had its protrusions lined with presumably failing sealant for many years. However, no significant water intrusion was noticed until the storm. We also note that Searcy testified that he found large cracks around nearly every roof protrusion, yet the water damage did not appear to be widespread shortly after the storm. Rather, it seemed to be concentrated at the front section of the motor home. This supports Mobley's assertion that a large amount of water entered the interior through a gap in one of the slides, which were apparently located near the front seats.

An "as is" stipulation, especially in a sale of a used thing, means that the thing is not warranted to be in perfect condition and free of all defects

which prior usage and age may cause. *Sanders v. Sanders Tractor Co., Inc.*, 480 So. 2d 913 (La. App. 2 Cir. 1985).

The parties may agree to an exclusion or limitation of the warranty against redhibitory defects. The terms of the exclusion or limitation must be clear and unambiguous and must be brought to the attention of the buyer. La. C.C. art. 2548. A buyer is not bound by an otherwise effective exclusion or limitation of the warranty when the seller has declared that the thing has a quality that he knew it did not have. *Id*.

To be effective, a waiver of warranty must: (1) be written in clear and unambiguous terms; (2) be contained in the contract; and (3) either be brought to the attention of the buyer or explained to him. *Wilks v. Ramsey Auto Brokers, Inc.*, 48,738 (La. App. 2 Cir. 1/15/14), 132 So. 3d 1009.

The trial court found that Sivils told Lawrence about the "as is" condition of the sale. However, this condition was not reduced to writing and could not have operated as a waiver of the warranty against a redhibitory defect. Nevertheless, this condition does have some significance.

We note that a seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things. La. C.C. art. 2521.

As this court stated in *Decker v Melton*, 52,213, p.4 (La. App. 2 Cir. 8/15/18), 253 So. 3d 856, 859, *writ denied*, 18-1530 (La. 12/3/18), 257 So. 3d 190:

> Apparent defects that could have been discovered by simple inspection are not redhibitory. A simple inspection is more than a casual observation; it is an examination of the article by the buyer with a view of ascertaining its soundness. Whether an inspection is reasonable depends on the facts of each case and

includes such factors as the knowledge and expertise of the buyer, the opportunity for inspection, and the assurances made by the seller.

Citations omitted.

If the roof was in as poor shape as Searcy maintained, then its condition should have been apparent to someone examining it. Lawrence was apparently not curious about whether the motor home leaked, even after Sivils asked him if the trade-in leaked. Lawrence seemed to be most concerned about the condition of the drivetrain. He also focused on the slides and other electrical parts. Lawrence admitted it was a big mistake not to get an inspection before buying the motor home.

The trial court thought $65,000 was a reasonable value for the motor home. Considering that Lawrence retrieved his trade-in from Hope's, Lawrence obtained the motor home for $45,000. The water damage did not affect the motor home's function as a motor vehicle as it could still be driven. Lawrence has taken few steps to prevent further damage to the motor home. Other than the temporary tarp, he has taken no steps to protect it from further water damage, even though it would cost around $2,000 to reseal the roof. Meanwhile, he spent $1,000 on batteries for the motor home.

Based on our review of the record, we cannot conclude that the trial court was manifestly erroneous in finding that Lawrence failed to establish a redhibitory defect.

***Unfair trade practices***

Lawrence contends that Maxwell's testimony that the motor home did not leak is not credible. He further argues that the evidence strongly shows that Maxwell acted in affirmative bad faith. Lawrence maintains that

Maxwell knew the motor home had been leaking long enough to cause interior damage and decided to sell the motor home anyway. He then attempted to shield himself from liability by selling it through a consignment sale.

La. R.S. 51:1405(A) declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. A private right of action for claims of unfair or deceptive trade practices is found in La. R.S. 51:1409(A).

Acts constituting unfair or deceptive trade practices are not specifically defined in the LUTPA but are determined on a case-by-case basis. *Cupp Drug Store, Inc. v. Blue Cross and Blue Shield of La.*, *Inc.*, 49,482 (La. App. 2 Cir. 1/7/15), 161 So. 3d 860, *writ denied*, 15-0571 (La. 5/22/15), 171 So. 3d 249. In general, acts which constitute unfair trade practices involve fraud, deception, misrepresentation, breach of fiduciary duty, or other unethical conduct. *Action Revenue Recovery, L.L.C. v. eBusiness Group, L.L.C.*, 44,607 (La. App. 2 Cir. 8/19/09), 17 So. 3d 999.

The trial court's denial of the unfair trade practices claim was not manifestly erroneous. There is no evidence that Maxwell acted with any intent to defraud or deceive anyone about the condition of the motor home. It is difficult to imagine that shortly before offering the motor home for sale, Maxwell would spend $10,000 to repair an engine, yet would knowingly conceal a roof condition that could have been resolved by spending around $2,000.

## CONCLUSION

For the foregoing reasons, the judgment is AFFIRMED at Lawrence's costs.

25