**HEARD, MCELROY &**
**VESTAL, L.L.C.**

**VERSUS**

**JOHN C. SCHMIDT AND**
**JOHN C. SCHMIDT CPA, LLC**

* NO. 2022-CA-0221

*

* COURT OF APPEAL

*

FOURTH CIRCUIT

* STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
FIRST JUDICIAL DISTRICT COURT, CADDO PARISH
NO. 610442, "DIVISION C"
Honorable Michael A Pitman,
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge
Rachael D. Johnson)

Bernard Slattery Johnson
COOK, YANCEY, KING & GALLOWAY, APLC
333 Texas Street, Suite 1700
P.O. Box 22260
Shreveport, LA 71120--2260

COUNSEL FOR PLAINTIFF/APPELLANT

Allison Anne Jones
Marcus D. Sandifer
DOWNER, JONES, MARINO & WILHITE, L.L.C.
401 Market Street
American Tower, Suite 1250
Shreveport, LA 71101

COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED**
September 21, 2022

This is a contractual dispute arising out of a certified public accounting ("CPA") firm's termination of one of its members from the firm. The parties to this dispute are the CPA firm—Heard, McElroy & Vestal, LLC ("HMV")—and the former member—John Schmidt ("Mr. Schmidt"), and his wholly-owned entity, John Schmidt, CPA, LLC ("Schmidt LLC") (collectively "Schmidt").[1] Seeking injunctive and declaratory relief, HMV filed this suit against Schmidt.

Following a hearing, the trial court granted in part and denied in part HMV's request for a preliminary injunction based on a non-competition clause in HMV's Operating Agreement (the "Agreement"). The Second Circuit Court of Appeal (the "Second Circuit") upheld the validity of the trial court's judgment on the preliminary injunction. *Heard, McElroy & Vestal, LLC v. Schmidt*, 52,783 (La. App. 2 Cir. 9/25/19), 280 So.3d 806 ("*Schmidt I*").

---

[1] When HMV terminated the membership, the entity—Schmidt LLC—had replaced Mr. Schmidt as the member; hence, Mr. Schmidt was a former member. But, as explained elsewhere in this opinion, Schmidt LLC and Mr. Schmidt stand in the same shoes, legally, for purposes of this litigation. For this reason, we refer to them in this opinion collectively as Schmidt for ease of discussion.

Thereafter, in May 2021, a three-day bench trial was held on the remaining claims between the parties. From the trial court's judgment partially in each party's favor, HMV appealed; Schmidt answered the appeal. Following the lodging of the appeal, the Second Circuit, *en banc*, recused itself. The Louisiana Supreme Court reassigned the appeal to this court. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

HMV is an accounting services firm with offices in Shreveport and Monroe, Louisiana. In 2008, HMV hired Mr. Schmidt as an employee in its Shreveport office. At that time, Mr. Schmidt had been a CPA for multiple years and had worked at an international CPA firm. Three years later, Mr. Schmidt became a firm member. Two years later, Mr. Schmidt's firm—Schmidt LLC—became a corporate firm member, replacing Schmidt; as a result, Mr. Schmidt became a Corporate Member Equity Owner. Mr. Schmidt (and later Schmidt LLC) were signatories to the Agreement. As a Corporate Member Equity Owner, Mr. Schmidt was bound by the Agreement.[2]

In April 2018, Ashley Nicole Flowers ("Flowers")—a senior tax manager, CPA, and long-term HMV employee under Schmidt's supervision—had a conversation with Schmidt. After obtaining Schmidt's promise to keep the conversation confidential, Flowers informed Schmidt that she planned to leave

---

[2] Article 2.2 of the Agreement provides that "with respect to all prohibitions and restrictions placed on Members under this Agreement, this term [Member] shall also include person(s) to whom the membership interests or stock of a Corporate Member is or was issued." After he was replaced by Schmidt LLC, Mr. Schmidt remained a Member, as defined by the Agreement, and remained bound by the terms of the Agreement. As mentioned elsewhere in this opinion, we refer to Schmidt and Schmidt LLC collectively as Schmidt.

HMV and to take certain HMV clients with her.[3] Flowers' plans included renting an office in the same building as HMV and opening a competing tax compliance business. Flowers subsequently sent Schmidt an email invite to a meeting with one of the HMV clients that she planned to take with her. Schmidt attended that meeting with Flowers at the client's office in late April 2018.

At the end of May 2018, Flowers sent an email to HMV's management giving a thirty-day notice that she was resigning her position effective at the end of June 2018. On that same day, Flowers notified building management that she wanted to maintain her parking space in the parking garage. Later that day, she called building management back and requested that it not disclose her request to HMV. Building management, however, had already done so. Upon learning of Flowers' plans, HMV's management immediately terminated Flower's employment. Thereafter, HMV's management questioned Schmidt about whether he knew of Flowers' plans.

Initially, Schmidt denied knowing of Flowers' plans. But, when confronted with evidence establishing his knowledge—including the email invite—Schmidt acknowledged that he knew of Flowers' plans. The following week, HMV's remaining members unanimously voted (eleven to one)—Schmidt being the only dissenter—to terminate Schmidt under Article 22.1 of the Agreement, which provides:

---

[3] Schmidt's working relationship with Flowers pre-dated their employment with HMV; they had worked together at the same international CPA firm before coming to HMV. Flowers came to HMV before Schmidt. Flowers, however, was never promoted to partner (member) at HMV.

> The Members may, by a two-thirds vote of the Members . . . terminate a Member at any time for cause, if that Member has engaged in conduct considered by the other Members to be unbecoming to a Certified Public Accountant or detrimental to the reputation of The Company.

The members found Schmidt's action in failing to advise other members of Flowers' plans satisfied both criteria under Article 22.1—was conduct unbecoming to a CPA and conduct detrimental to HMV's reputation.

In August 2018, HMV commenced this suit against Schmidt. HMV sought an injunction based on Schmidt's violation of the non-competition provision set forth in Article 25 of the Agreement. HMV also sought a declaration that Schmidt's termination was lawfully done according to Article 22.1 of the Agreement.

Shortly before the injunction hearing, HMV's members discovered that Schmidt had conducted an outside accounting practice as a paid tax return preparer during his ten years at the firm—both as an employee and as a member (the "Side Practice")—and had failed to disclose the Side Practice to HMV's members. The members voted that Schmidt's actions in conducting the Side Practice satisfied both criteria under Article 22.1 of the Agreement—conduct both unbecoming to a CPA and detrimental to HMV's reputation. HMV's members, thus, voted to terminate Schmidt under Article 22.1 of the Agreement for this additional, independent reason. One week later, HMV filed an amended petition adding an averment in support of its claim for declaratory relief that Schmidt's termination was proper under Article 22.1 of the Agreement for this additional, independent reason.

In September 2018, following a hearing, the trial court granted in part and denied in part HMV's request for an injunction. The injunction, based on the non-competition provision in Section 25 of the Agreement, was for two years.[4] As noted elsewhere in this opinion, in the prior appeal in this matter, the Second Circuit upheld the validity of the trial court's judgment on the injunction. *Schmidt I, supra.*

Meanwhile, HMV expanded the suit through multiple amendments adding defendants—Flowers and her business, Pelican Tax & Consulting, CPA, LLC ("Pelican") (collectively the "Flowers Defendants")—and adding claims against not only the Flowers Defendants, but also Schmidt. Schmidt filed a reconventional demand against HMV alleging breach of contract and other claims, including a request for a proper accounting of his capital account. Flowers also filed a reconventional demand against HMV. Both sides filed Louisiana Unfair Trade Practices Act ("LUTPA") claims against each other.

Before the bench trial, the Flowers Defendants and HMV settled their claims against each other. As part of the settlement, HMV dismissed its claims against Schmidt that were based upon Schmidt's liability as Flowers' solidary obligor. The only parties remaining at the time of the trial were HMV and Schmidt. At the end of the trial, the trial court requested the parties brief the following issues:

- The validity of HMV's termination of Schmidt as a member under Article 22 of the Agreement;

---

[4] By the time of the trial in this matter, the injunction had expired.

- The proper calculation of the goodwill element of Schmidt's capital account under Article 17.2.1(a) of the Agreement;

- The deduction made by HMV for an alleged outside practice—which Schmidt characterized as the friends and family work—from Schmidt's capital account calculation; and

- The validity of each party's damage claim for unfair trade practices under the LUTPA.

On July 30, 2021, the trial court issued written reasons for judgment, stating its findings on each of the issues as follows:

- HMV terminated Schmidt with sufficient cause under Article 22.1 of the Agreement;

- HMV failed to prove its goodwill reduction of Schmidt's capital account by a preponderance of the evidence, making this reduction of Schmidt's capital account improper;

- Schmidt's friends and family work did not constitute an outside practice in violation of the Agreement, making this reduction of Schmidt's capital account improper; and

- Neither party's actions arose to a LUTPA violation.

On September 3, 2021, the trial court rendered judgment partially in favor of each party. From the trial court's judgment, HMV appealed seeking reversal of the trial court's findings on three of the four issues—all of the issues except whether Schmidt was terminated with sufficient cause under Article 22.1 of the Agreement. Schmidt answered the appeal seeking reversal of the trial court's finding on the termination issue.[5]

---

[5] On appeal, HMV assign the following errors:

(1) The trial court erred as a matter of law in finding that Article 17.2.1 of the Operating Agreement is ambiguous on the basis of conflicting testimony.

(2) The trial court erred as a matter of law in failing to apply La. R.S. 12:1314(A)(5)'s requirement that Schmidt prove under strict judicial scrutiny the

## DISCUSSION

The issues presented here can be divided into three categories: contractual, factual, and LUTPA. The contractual and factual issues overlap; thus, we divide our analysis into two parts—(i) contractual and factual issues; and (ii) LUPTA issue.

**Contractual and Factual Issues**

This instant appeal presents primarily contract interpretation issues. The contract is HMV's Operating Agreement—the Agreement. The parties raise the following three issues regarding the Agreement:

(i)     whether HMV properly terminated Schmidt under Article 22.1 of the Agreement ("Article 22.1");[6]

(ii)    whether HMV properly calculated Schmidt's capital account under Article 17.2.1 of the Agreement ("Article 17.2.1");[7] and

---

fairness of transactions in which he surreptitiously prepared tax returns for paying clients for his individual account without the informed consent of a majority of the disinterested members, leading to a failure to enforce Article 3.1.1 of the Operating Agreement.

(3) The trial court erred as a matter of law in holding that its conclusion that Schmidt's secret practice was not a violation of the agreement meant that his conduct did not violate the Louisiana Unfair Trade Practices Act.

Answering the appeal, Schmidt assigns the following error: "[t]he trial court erred as a matter of law in finding HMV terminated Schmidt under Article 22.1 of the Operating Agreement with sufficient cause."

[6] Article 22.1 provides "[t]he Members may, by a two-thirds vote of the Members . . . terminate a Member at any time for cause, if that Member has engaged in conduct considered by the other Members to be unbecoming to a Certified Public Accountant or detrimental to the reputation of The Company."

[7] Article 17.2.1 (a) provides: "[f]or the purpose of determining the amount of the accrual capital account of any Former Member that has . . . been terminated under Article 22, any goodwill listed as an asset of The Company shall be valued at zero. . . ."

(iii) whether a member is prohibited from engaging in a friends and family practice, an outside practice, or both under Article 3.1.1 of the Agreement ("Article 3.1.1").[8]

To provide a background for analyzing these issues, we first outline the applicable standards of review and principles of contractual interpretation. Summarizing the applicable standards of review for contractual interpretation, a commentator on appellate practice observed as follows:

- Legal conclusions often are involved in cases dealing with construction of a contract.

- When appellate review is not based on any factual findings at trial level but instead on an independent review and examination of a contract on its face, the manifest error rule does not apply. The question is simply whether the trial court was legally correct.

- Whether a contract is ambiguous is a question of law reviewed for legal correctness.

- While the parties' subjective intent is a question of fact, which will not be reversed absent manifest error, the ultimate determination of the parties' intent concerning the contract is a mixed question of law and fact.

Roger A. Stetter, LA. PRAC. CIV. APP. § 10:99 (2021) (internal citations omitted and reformatted); *see also Sims v. Mulhearn Funeral Home, Inc.*, 07-0054 (La. 5/22/07), 956 So.2d 583, 590 (observing that the ambiguity of a contract is a legal question); *Borden, Inc. v. Gulf States Utilities Co.*, 543 So.2d 924, 928 (La. App. 1st Cir. 1989).

The threshold inquiry in resolving an issue of contractual interpretation is whether the words and provisions of the contract are ambiguous. The test for determining whether a contract is ambiguous is a jurisprudential one. The

---

[8] Article 3.1.1 provides "[e]ach Member shall devote his entire working time and professional skill and attention to the advancement of the business affairs of The Company."

jurisprudence has observed that "a contract is ambiguous when, *inter alia*, its 'written terms are susceptible to more than one interpretation,' when 'there is uncertainty as to its provisions,' or when 'the parties' intent cannot be ascertained from the language used.'" *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 668 (5th Cir. 2012) (citing *Campbell v. Melton*, 01-2578, p. 6 (La. 5/14/02), 817 So.2d 69, 75); *see also Guest House of Slidell v. Hills*, 10-1949, pp. 3-4 (La. App. 1 Cir. 8/17/11), 76 So.3d 497, 499-500.

When the words and provisions of the contract are found to be clear and explicit (unambiguous), no extrinsic evidence can be introduced. *Frischhertz Elec. v. Housing Auth*, 534 So.2d 1310, 1312 (La. App. 4th Cir. 1988). When a contract is unambiguous, "[a] court has no authority to reach beyond the four corners of the document." *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 653 (5th Cir. 1989). Conversely, when a contract is ambiguous, the use of extrinsic evidence, including expert testimony, is proper. *Frischhertz Elec.*, 534 So.2d at 1314.

The Louisiana Civil Code contains instructions regarding the proper method of contractual interpretation. *Armstrong Airport Concessions v. K-Squared Rest., LLC*, 15-0375, p. 10 (La. App. 4 Cir. 10/28/15),178 So.3d 1094, 1101. Those instructions are set forth in La. C.C. arts. 2045 to 2057. The key instruction is set forth in La. C.C. art. 2045, which instructs that the judiciary's task in resolving a contractual interpretation dispute is to determine the parties' common intent. A corollary principle is that "[w]hen the words of a contract are clear and explicit, and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. With these contract interpretation

10

principles in mind, we turn to the three issues of contractual interpretation presented here.

*HMV properly terminated Schmidt under Article 22.1*

Schmidt contends that the trial court legally erred in finding HMV properly terminated him under Article 22.1. Schmidt, as the trial court observed, takes the position that Article 22.1 requires a very high level of professional misconduct. HMV counters that Schmidt is challenging the trial court's factual, not its legal, findings. According to HMV, this is evident in Schmidt's contention that the evidence and testimony presented at trial failed to establish that the reasons the members relied upon, alone or collectively, constituted conduct satisfying Article 22.1's criteria—conduct unbecoming to a CPA or conduct injurious to HMV's reputation. HMV emphasizes that questions of law simply do not turn on evidence and testimony.

The trial court's resolution of the termination issue turned on its legal finding that Article 22.1 is unambiguous. The trial court provided the following reasons for its finding:

> Article 22.1 is clear and explicit. It does not predicate the "cause" for termination upon a "high level of professional misconduct." Rather, Article 22.1 is based upon a subjective standard of what two-thirds of the members "consider" to be unbecoming to a Certified Public Accountant or detrimental to the reputation of HMV. Schmidt acknowledged that he breached his fiduciary duty owed to HMV by lying to his partners about his knowledge regarding Flowers' plans to start an accounting practice that would compete with HMV and take some of HMV's biggest clients. Schmidt's decision to conceal Flowers' plans (that were detrimental to HMV) and later lie to his partners clearly constituted a breach of his fiduciary duty.

On appeal, Schmidt repeats the argument that Article 10.1.3 of the Agreement ("Article 10.1.3") sanctioned his conduct in concealing Flowers' plans.[9] Rejecting this argument, the trial court observed:

> Although [Article 10.1.3] permitted Schmidt to act for HMV in all matters, as a member of the firm he also had a fiduciary duty to act on behalf of the firm's best interest. Schmidt's conscious choice to conceal his knowledge about Flowers' plans did not advance the firm's best interest and was, in fact, detrimental to the firm's interest. Moreover, Schmidt's decision to lie when asked about Flowers' plans severed all trust with his fellow members. Thus, Schmidt's actions of withholding information about Flowers' plans and subsequently lying to his partners constituted conduct considered by the other members to be unbecoming a Certified Public Accountant and detrimental to the reputation of HMV. Importantly, every member except Schmidt, considered his dishonesty and deceit to be unbecoming to a Certified Public Accountant or detrimental to the reputation of HMV. Accordingly, Schmidt's actions served as legitimate reasons for HMV to terminate Schmidt under Article 22.1 of the Operating Agreement.

Schmidt's reliance on Article 10.1.3 is misplaced. The trial court did not legally err in finding Article 22.1 unambiguous and factually finding that the requirements for termination under that article were met.

*HMV properly calculated Schmidt's capital account under Article 17.2.1*

HMV contends that the trial court erred, as a matter of law, in finding Article 17.2.1 ambiguous based on the conflicting testimony of HMV's and Schmidt's expert witnesses. According to HMV, the trial court's reliance upon the conflicting expert testimony to find the provision ambiguous is an error of law that is reviewable under a *de novo* standard. Schmidt counters that the trial court correctly found that Article 17.2.1 is ambiguous and considered the conflicting expert testimony to resolve this issue in his favor.

---

[9] Article 10.1.3 provides that "The Company shall be conducted under the exclusive management of its Members, who shall have exclusive authority to act for The Company in all matters."

To place this technical issue in context, we first quote the trial court's synopsis of the facts developed at trial on this issue:

> Following Schmidt's termination in November 2018, HMV assessed Schmidt's capital account under the provisions provided for in Article 17 of the Operating Agreement.[10] Pursuant to HMV's interpretation of Article 17.2.1(a) of the Operating Agreement, the firm deducted $153,369.40 from Schmidt's capital account reconciliation for HMV's "goodwill" liability.

> The method of HMV's goodwill liability calculation was heavily contested at trial. Each party presented qualified and credible experts in the field of accounting who testified as to general accounting principles and the method by which goodwill payments are calculated pursuant to the Operating Agreement.

> Robert Dean[11] testified that HMV's Operating Agreement calls for goodwill payments to members upon separation as an incentive to maintain it "firm-first" approach. In essence, Dean indicated that these payments were put in place to encourage continued membership in the firm by earning the right to post-retirement payments and to discourage members from leaving the firm by reducing departing members' capital.

> Dean's testimony was supported by HMV's expert witness, Stephen Bayer, who testified that Article 17.2(a) of the Operating Agreement required the firm to value its "goodwill" asset at zero and then multiply that reduction by Schmidt's ownership interest of 4%. As a result, Bayer determined that HMV was correct in reducing Schmidt's

_____

[10] Article 17.1 provides:

"When a Member . . . is terminated (Article 22) . . . he shall cease to be a Member (such a Member being referred to herein as a "**Former Member**"), and neither he nor his estate or any other entity holding his interest shall have any further interest in The Company or is assets. The Former Member . . . shall be entitled to receive the following:

(a) The Former Member's accrual capital account as recorded on the books as of the effective date of separation, less any net amounts owed by The Company by that Former Member, payable as provided below in Section 17.2.

(b) Any net amounts due by The Company as of the effective date of separation for loans, un-drawn profits, or otherwise, payable as provided below . . . .

(c) Payment for goodwill to the extent provided below in Section 17.2 ("**Goodwill Payment**"), except for those Members whose separation is as a result of termination (Article 22) or withdrawal (Article 13)."

[11] Robert Dean was HMV's Managing Member.

capital account by his share of what had been listed as an asset value for the firm's goodwill.

Schmidt disagreed with both Dean and Bayer's interpretation of Article 17.2(a). Schmidt argued that if HMV wanted a member to lose not only their goodwill payments but to simultaneously have their capital account reduced by some goodwill value adjustment under Article 17.2.1(a), the Operating Agreement would have expressly said so.

Schmidt's expert, Professor Ralph Litolff supported Schmidt's argument, testifying that HMV "double dipped" when it valued Schmidt's goodwill asset at zero *and* deducted $153,369.40 from Schmidt's capital account. Litolff also observed that HMV took this action without any authority in the [O]perating Agreement to do so. (Emphasis in original).

Rejecting HMV's argument that it was entitled to a goodwill reduction from Schmidt's capital account reconciliation, the trial court found that HMV failed to carry its burden of proof. In so doing, the trial court observed as follows:

HMV failed to prove that its reduction from Schmidt's capital account reconciliation was justified. Article 17.2.1(a) of the Operating Agreement states, "[f]or the purpose of determining the amount of the accrual capital account of any Former Member that has been terminated under Article 22, *any goodwill listed as an asset of the company shall be valued at zero... .*"

Plaintiff argues that Article 17.2.1 of the Operating Agreement is clear and explicit, and thus the Court's task is simply to apply it as written without adverting to any interpretive techniques. The Court disagrees.

Both HMV and Schmidt presented credible and experienced expert witnesses, along with the testimony of HMV's Managing Member, Robert Dean, and Schmidt who are both experienced CPAs. The testimony supports two plausible competing opinions regarding the interpretation and application of Article 17.2.1 (a) of the Operating Agreement.

On the one hand, Robert Dean and Steven Bayer took the position that Article 17.2.1 (a) of the Operating Agreement functioned as a punitive clause that required terminated members to forfeit goodwill payments while remaining liable for their ownership interest in the firm's goodwill liability. On the other hand, Schmidt and Professor Ralph Litolff testified that the Article, although punitive in

nature, did not permit HMV to "double dip," and simultaneously collect Schmidt's 4% ownership interest in HMV's goodwill liability.

> As shown by the testimony of Dean, Bayer, Schmidt and Litolff, the language in the Article 17.2. 1 is ambiguous. Ultimately, each expert witness provided a thorough explanation of their methodical approach to the interpretation and application of Article 17.2.1. As a result, there exists two plausible and reliable approaches to the reading of the Article. Therefore, HMV failed to reach its burden of proving that more likely than not its approach was correct, leaving the Court without a clear answer. Accordingly, considering the weight of the evidence, HMV failed to carry their burden of proof and HMV's deduction from Schmidt's capital account was improper. (Emphasis in original).

On appeal, HMV contends that the trial court erred in failing to properly apply the contractual interpretation principles by engaging in "further interpretation" without first analyzing the language of the provision determine whether it was ambiguous. This argument ignores that a trial court's determination of whether a contractual provision is ambiguous involves a process of interpretation. *See* Patrick S. Ottinger, *Principles of Contractual Interpretation*, 60 LA. L.REV. 765, 766 (Spring 2000) (observing that "the modification of the word interpretation in La. C.C. art. 2046 by the word 'further' is a recognition that the threshold inquiry as to a contract's clarity is itself a process of interpretation"). Here, the trial court's process of interpretation began by its denial of HMV's pre-trial motion to exclude Schmidt's expert's testimony.[12] The trial court's ultimate determination, following the trial, was that Article 17.2.1 is ambiguous.

---

[12] Before trial, HMV raised the issue of whether expert testimony on the meaning of Article 17.2.1 of the Agreement was warranted. HMV did so by filing a Motion to Exclude the testimony of Schmidt's Proffered Expert Witness, Ralph A. Litolff, Jr. In its motion, HMV argued that because Article 17.2.1 is unambiguous, La. C.C. art. 2047 was inapposite; The trial court denied the motion. As a result, HMV submitted its own expert, Mr. Stephen Bayer.

HMV's reliance on the trial court's statement in its reasons for judgment as establishing a legal error in the trial court's process of interpretation of Article 17.2.1 is misplaced. It is well-settled that a trial court's reasons for judgment are not part of the judgment and that appellate courts review judgments, not reasons for judgment. *Bruno v. CDC Auto Transp., Inc.*, 2019-1065, p. 9 (La. App. 4 Cir. 6/3/20), 302 So.3d 8, n. 11 (citations omitted). But, appellate courts may consider a trial court's reasons for judgment to obtain insight into the trial court's judgment. *Id.* Regardless, we find no error in the trial court's determination that Article 17.2.1 is ambiguous.

The contract provision at issue involves a technical matter—the calculation of a terminated member's capital account and the valuation of any permissible reductions and set offs. The terms of art or terms with specialized use and meaning in Article 17.2.1 are "goodwill" and "value." HMV's position is that Article 17.2.1 simply assigns a value—zero—to goodwill in making the capital account calculation. HMV's expert, Mr. Bayer, testified at trial that an elementary principle of accounting is the following equation: Assets - Liabilities = Capital. Given this equation, the reduction of assets, by definition, reduces capital. HMV contends that it is immaterial to this determination whether the concept of "value"—the noun— may have varying meanings; the contract directs that the formula for calculating the capital account requires that any goodwill be "valued"—the verb—at zero. According to HMV, mathematical formulas are simply not subject to interpretation, but only calculation. HMV further contends that Article 17.2.1 is clear and explicit and that it is entitled to have it enforced as written. *See* La. C.C. art. 1983 (providing that "[c]ontracts have the effect of law for the parties").

16

Moreover, HMV emphasizes that parties are "free to contract for any object that is lawful, possible, and determined or determinable." La. C.C. art. 1971.

Schmidt counters that Article 17.2.1 uses the term "value"—a term of art in accounting, subject to multiple interpretations. Schmidt, thus, contends that the trial court did not err in receiving expert testimony on the meaning of Article 17.2.1. We agree.

As a commentator has observed, "extrinsic evidence, such as testimonial proof, is many times the only way in which the court may be informed of the technical meaning of words of art and technical terms, which sufficiently explains that such evidence is admissible for that purpose." Saul Litvinoff, 5 LA. CIV. L. TREATISE, LAW OF OBLIGATIONS § 12.101 (2d ed. 2021). This principle is codified in La. C.C. art. 2047, which provides that "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter." Pursuant to La. C.C. art. 2047, the trial court in this case correctly considered the conflicting expert testimony in determining the meaning of Article 17.2.1.

Here, as the trial court observed, both sides presented expert testimony regarding the proper methodology to calculate Schmidt's capital account. A trial court's acceptance of one expert's testimony over another's cannot be said to be manifestly erroneous. *See Texas Int'l Petroleum Corp. v. Delacroix Corp.*, 94-1426, pp. 4-5 (La. App. 4 Cir. 1/31/95), 650 So.2d 815, 818 (observing that "[u]ltimately the case boiled down to one of weighing conflicting expert testimony" and that absent "manifest error, this Court does not have the authority to reverse the trial court's determinations in the matter of conflicting of expert

17

testimony"). We, thus, find no error in the trial court's finding that HMV was not entitled to take a goodwill reduction in calculating Schmidt's capital account.

*Friends and Family Policy*

HMV argues that the Side Practice—Schmidt's preparing tax returns in exchange for direct payments to him or his LLC, rather than HMV, during the time he worked for HMV—violated Article 3.1.1, which required him to "devote his entire working time and professional skill and attention to the advancement of the business affairs of [HMV]." According to HMV, Schmidt's breach of his fiduciary duty in conducting the Side Practice gave rise to a claim against him on two separate bases: (i) a contractual claim for damages for failure to perform his obligations under the Agreement; and (ii) a LUPTA claim for damages for unfair trade practices. The trial court rejected both arguments. We separately address them.

To provide a backdrop for addressing this fact-intense issue, we quote the trial court's summary of the trial testimony on this issue:

> Schmidt's receipts from his alleged outside practice for each year from 2008 to 2017, was $16,000.00 to $20,000.00 a year. [HMV calculated a $20,000.00 per year average, and Schmitt calculated a $16,000.00 per year average.] As a result of this alleged outside practice, HMV reduced Schmidt's capital account by $168,341.00. This reduction was based on the notion that Schmidt violated his obligation under Article.3.1.1 of the Operating Agreement. HMV also took the position that Article 18.1 of the Operating Agreement entitled the firm to reduce any payments due to Schmidt by the amount of "any claims" by HMV against him, including "any costs" incurred by the firm.[13]
>
> Schmidt introduced evidence concerning the firm's "friends and family" policy, a customary practice of HMV, wherein members and employees performed tax returns for their family and friends without

---

[13] Article 18.1 of the Agreement provides for a setoff of certain items under certain circumstances. As noted elsewhere in this opinion, Schmidt contests whether Section 18.1 applies here. Regardless, given our finding the trial court did not err in finding HMV was not entitled to a setoff, we pretermit addressing the issue of whether Article 18.1 applies.

billing them through HMV. Managing Member, Robert Dean, testified that he and other members routinely performed returns for family without utilizing HMV's formal billing process.

Schmidt testified that he prepared his friends and family returns at his home office, using his own equipment and supplies. Further, Schmidt argued that HMV did not consider this "friends and family work" part of its "business affairs," as the friends and family work produced low fees that HMV did not desire. Schmidt based this argument on an HMV member meeting held in late October 2012, wherein the membership affirmatively voted to prohibit members from bringing in new clients that produced fees under $500.00. That minimum fee amount was later increased to $1,000.00.

Based on the evidence presented, the trial court found that HMV's friends and family policy was not clearly defined. The trial court further found that the work Schmidt performed during his employment at HMV for his friends and family—the Side Practice—did not equate to an "outside practice" in violation of the Agreement. In so finding, the trial court observed in its written reasons for judgment:

Article 3.1.1 of the Operating Agreement required Schmidt to "devote his entire working time and professional skill and attention to the advancement of the business affairs of [HMV]."

Both Dean and Schmidt acknowledged that a friends and family policy existed among the members. Specifically, Dean testified that he routinely performed tax returns for his family members without utilizing HMV's formal billing process. Likewise, under this unwritten custom, Schmidt also prepared tax returns for his friends and family without employing HMV's formal billing process, and instead collected direct payments for his work.

Schmidt testified that he prepared these returns at his home office with his own supplies. Further, Schmidt testified that he prepared these returns for individuals who the firm found unprofitable. [At trial, Managing Member, Robert Dean, and Schmidt both testified that the minimum fee threshold doubled from $500.00 to $1,000.00.]

The membership clearly considered Schmidt's friends and family returns unprofitable as it voted to prohibit members from bringing in clients that produced fees under $1,000.00. Furthermore, Schmidt noted that almost all of the returns he prepared generated fees

under the $1,000.00 threshold. Further, when one of Schmidt's clients generated fees which met HMV's minimum threshold, he transitioned the client to HMV. [The loss incurred by HMV for the few clients Schmidt failed to transition produced profits that were so *de minimis* in light of the profit that Schmidt brought into the firm that this Court feels those clients need not be addressed.]

This customary practice taken advantage of by Dean and other members of HMV is not found in the Operating Agreement. Further, the Operating Agreement lacks any language directing how, if any, direct payments are to be paid to HMV under this custom. Rather, the Operating Agreement simply calls for members to devote their entire working time and professional skill and attention to the advancement of HMV's business affairs.

Schmidt consistently advanced, the financial interests of HMV on an annual basis. Throughout Schmidt's employment with HMV, he contributed a substantial profit to the firm. Importantly, part of Schmidt's income at HMV derived from origination fees for introducing new clients into the firm. It would be unjust to penalize Schmidt for following a custom that was practiced by the Managing Member and other members of HMV, particularly when the parameters of that custom are not clearly defined. Accordingly, HMV's offset for Schmidt's "friends and family" practice was improper.

On appeal, HMV challenges the trial court's decision equating Schmidt's Side Practice, which included fee-paying clients, with other members' practice of preparing a limited number of tax returns primarily to family members for free. HMV also contends that the trial court erred in failing to apply La. R.S. 12:1314(A)(5).[14]

Schmidt counters that HMV has never been able to harmonize its own friends and family policy—HMV's unwritten policy of allowing members to

---

[14] La. R.S. 12:1314(A)(5) provides that a member:

> Shall account to the limited liability company and hold as trustee for it any profit or benefit derived by him, without the informed consent of a majority of the uninterested members in accordance with R.S. 12:1318(C), from any transaction connected with the conduct or winding up of the limited liability company or from any personal use by him of its property unless he proves under strict judicial scrutiny the fairness of the transaction to the limited liability company.

prepare tax returns for friends and family—with the firm's policy disallowing members to prepare tax returns for under $1,000.00 (originally $500.00). Schmidt also contends that HMV's reliance on La. R.S. 12:1314(A)(5) is misplaced given his conduct fit within HMV's poorly defined friends and family policy.

Moreover, Schmidt stresses that these friends and family tax returns that he prepared generally fell under the required $500 to $1000 minimum for HMV's partners to expend their professional time preparing. Schmidt also stresses that these friends and family for whom he prepared these returns were not HMV's clients; rather, he characterizes in his brief these family and friend as mostly members of his church. After understanding that Schmidt's friends and family clients were not deemed worthy by HMV to be its clients, it follows, Schmidt contends, that HMV's claim under La. R.S. 12:1314(A)(5) that Schmidt must account to HMV for profit derived "from any transaction connected with the conduct of the company's business" is unavailing.

The trial court's factual finding that the Schmidt's conduct in engaging in the Side Practice fit within the firm's unwritten, poorly defined friends and family policy—and was not an outside practice prohibited by Section 3.1.1—is supported by the record and is not manifestly erroneous. Given this finding, we find, as Schmidt contends, that La. R.S. 12:1314(A)(5) is inapposite here.

**LUTPA Claims**

The trial court found neither party's actions arise to a LUTPA violation. Schmidt does not challenge the trial court's dismissal of his LUTPA claim against

21

HMV; hence, only HTV's LUTPA claim against Schmidt is at issue on appeal. HMV contends that the trial court legally erred in extending its holding that Schmidt's conduct in engaging in the Side Practice did not violate the Agreement to mean that Schmidt's conduct did not violate the LUTPA. HMV also cites the jurisprudence holding that a breach of fiduciary duty claim is almost always an unfair trade practice in violation of the LUTPA. *ODECO Oil & Gas Co v. Nunez*, 532 So.2d 453 (La. App. 1st Cir. 1989). HMV contends that principle applies here given Schmidt's breaches of its fiduciary duty to the firm.

Schmidt counters that HMV's LUTPA claim is simply an attempt to tack a LUTPA claim onto a breach of contract claim. Schmidt stresses that he did not use his position as an HMV member to detract business from HMV through his friends and family practice; thus, he contends that the trial court correctly found he did not violate the LUTPA. Schmidt also stresses that the only breach of fiduciary duty the trial court found that he committed pertained to HMV's entirely separate, independent claim of Schmidt's failure to disclose his knowledge of Flowers' plans. That separate claim cannot form the basis of a LUTPA claim.

The governing statutory provision, La. R.S. 51:1405(A), prohibits any "unfair or deceptive acts or practices in the conduct of any trade or commerce"; and La. R.S. 51:1409(A) grants a right of action to "[a]ny person who suffers any ascertainable loss" from a violation of this prohibition. The statute is silent as to what acts constitute unfair or deceptive trade practices. What constitutes unfair or deceptive practices has been left to the judiciary to determine on a case-by-case

basis. *Cupp Drug Store. Inc, v. Blue Cross & Blue Shield of Louisiana. Inc*., 49,482 (La. App. 2 Cir. 1/7/15), 161 So.3d 860, 869.[15] But, "the range of prohibited practices under LUTPA is extremely narrow." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.,* 09-1633, p. 11 (La. 4/23/10), 35 So.3d 1053, 1060.

What LUTPA does not forbid, the judiciary has determined, includes "sound business practices, the exercise of permissible business judgment, [and] appropriate free enterprise transactions." *Turner v. Purina Mills, Inc*., 989 F.2d 1419, 1422 (5th Cir. 1993). Simply stated, LUPA "does not forbid a business to do what everyone knows a business must do: make money. . . so long as the means used are not egregious." *Id.* Nor is LUTPA "an alternate remedy for simple breaches of contract." *Id.* Indeed, the judiciary has observed that "[t]here is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Id.* (internal citations omitted.).

Applying these principles, we find that the trial court did not manifestly err in concluding that Schmidt's conduct in engaging in the Side Practice did not reach the level of unfair or deceptive practices prohibited by the LUTPA.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED**

---

[15]See *Dufau v. Creole Engineering, Inc*., 465 So.2d 752, 758 (La. App. 5th Cir. 1985) (observing that to recover under LUTPA a plaintiff must prove "some element of fraud, misrepresentation, deception, or other unethical conduct"); *Moore v. Goodyear Tire & Rubber Co*., 364 So.2d 630, 633 (La. App. 2d Cir.1978) (observing that the plaintiff must show the alleged conduct "offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious").